(No. 54682.—

THE PEOPLE OF THE STATE OF ILLINOIS, Appellant,
v. STANLEY A. LIPPERT, Appellee.

*Opinion filed February 19, 1982.*

174

Tyrone C. Fahner, Attorney General, of Springfield, Thomas J. Homer, State's Attorney, of Lewistown (John X. Breslin and Gary F. Gnidovec, of the State's Attorneys Appellate Service Commission, of Ottawa, of counsel), for the People.

Robert Agostinelli, Deputy Defender, and Frank W. Ralph, Assistant Defender, of the Office of the State Appellate Defender, of Ottawa, for appellee.

JUSTICE UNDERWOOD delivered the opinion of the court:

At the conclusion of a bench trial in the circuit court of Fulton County defendant, Stanley Lippert, was found guilty of the armed robbery of two elderly couples and was sentenced to a term of six years' imprisonment. A divided appellate court held that a showup identification of defendant by the robbery victims and a subsequent confession should have been suppressed and remanded the cause for a new trial. (93 Ill. App. 3d 273.) That court held that *Terry v. Ohio* (1968), 393 U.S. 1, 20 L. Ed. 2d 889, 88 S. Ct. 1868, provided insufficient basis for the detention and transportation of the defendant to the site of the showup. We granted the State's petition for leave to appeal.

At the hearing on the motion to suppress, a deputy sheriff, Sergeant Daniel Dugan, testified that he responded to a call from the Riverview Inn, Liverpool, Illinois, about 11 p.m., November 5, 1979. There he interviewed the complainants, Mr. and Mrs. Raymond Morse and Mr. and Mrs. Charles Scott, who told him that they had been robbed at gunpoint by four young men about 25 minutes earlier. The robbery occurred on the Liverpool road, the only northbound route out of town, at a point about one-half mile south of Illinois route 24. This was two to three miles from the Inn. The Morses' car had developed engine trouble, and they had pulled to the side of the road. The

victims had flagged down an approaching car containing four young men and asked for assistance. After tinkering with the engine for a few minutes, one of the men, later identified as defendant, obtained a rifle from their car, pointed it at the victims and announced the robbery. About $30 was taken. The robbers then got back in their car and left, headed northward.

According to Deputy Dugan's testimony, one of the robbers was described to him as about 5 feet 11 inches in height with medium length blond hair, and another as having bushy brown hair and wearing a blue jacket.

The deputy testified that he requested the Morses and Scotts to remain at the Inn while he checked the area. He then proceeded northward on the Liverpool road and within a few minutes received a radio message from another deputy that a car was approaching him from the rear. At a point between Morse's car and route 24, he backed his squad car into a driveway so that his bright lights would shine onto the road and across traffic. He saw a car without license plates approaching, and observed that the driver had medium length light brown hair and the passenger had bushy hair and was wearing a blue coat. He testified that the two matched the descriptions given him. The car passed at about 30 miles per hour and he followed, stopping the car at the route 24 intersection. When he approached the car he saw that it had a temporary registration certificate taped on the passenger side of the windshield. Defendant, who had been driving, identified himself by presenting a uniform traffic citation in lieu of a driver's license. He and his passenger, William Long, were frisked, Deputy Dugan noting that defendant had light brown hair and was about 5 feet 11 inches tall.

Defendant and Long were taken back to the Liverpool Inn, defendant in Deputy Dugan's squad car and Long in another squad car which had arrived after the stop. Deputy Dugan read defendant his *Miranda* rights during this trip

and defendant acknowledged he understood them. However, defendant denied knowing anything about the robbery. They arrived at the Riverview Inn about 55 minutes after the robbery. Mrs. Morse came out and identified defendant and Long, who were sitting in the squad cars in which each had arrived. Mrs. Morse told Deputy Dugan that defendant had complained about a cut finger during the robbery, and, upon checking defendant's hands, Dugan found that defendant had stitches in his little finger. Mr. Morse then came out and identified defendant as the robber who held the rifle.

Deputy Dugan questioned defendant at this time and defendant told him that two others, Darrell Brazee and Richard Sale, had committed the robbery while he sat in the car. After the robbery, Brazee and Sale were dropped off near Brazee's house in Liverpool, where they were going "'coon hunting." They had taken the .22 rifle with them. Defendant was handcuffed and driven to an area near Brazee's home. After about 25 minutes Brazee and Sale were arrested as they emerged from a wooded area. They were carrying a flashlight and a .22 rifle. The four were then taken to the county jail, about 20 minutes away.

Defendant, Sale and Brazee each gave short written statements that night admitting their participation in the robbery. (Long, who was 16, was turned over to juvenile authorities.) The following morning more detailed statements were tape recorded and later transcribed. The three confessions corroborated each other in almost all respects. There is no contention here that *Miranda* warnings were inadequate or that the confessions were involuntary. The other witnesses called by the State at the motion hearing testified to the *Miranda* warnings and as witnesses to the statements. Defendant testified, contrary to the State's witnesses, that he was handcuffed before the showup. He also stated that he had been drinking that night.

The trial court denied the motion to suppress, finding

that the confessions were voluntarily given and that Deputy Dugan "had probable cause to stop the car" because of the lack of license plates and because of his "identification of these two individuals being possibly involved in the robbery according to the description which he had been furnished." It was then stipulated that the testimony at trial would be the same as at the hearing on the motion to suppress and that defendant had been identified by the Morses and Scotts, both at the Inn and in court. The confessions were also admitted. The only additional witness called at trial testified that the defendant had been read his *Miranda* rights before he confessed. Defendant renewed his motion to suppress but offered no other evidence, and a judgment of guilty was entered.

There is, of course, no doubt that the absence of license plates justified the initial stop of defendant's car. The determination that the temporary registration was valid, however, eliminated the absence of license plates as authority for defendant's further detention, and that authorization must be found, if at all, in the existence of probable cause to arrest defendant or under *Terry v. Ohio* (1968), 392 U.S. 1, 20 L. Ed. 2d 889, 88 S. Ct. 1868. While one member of the appellate court stated that the State had there conceded the absence of probable cause, that conclusion is now disputed by the State, which indicates it believed the trial court's denial of the motion to suppress was predicated on *Terry* and accordingly focused its argument upon that issue.

Defendant, however, argues that even if the initial stop was valid under *Terry,* his subsequent detention and transportation must be supported by nothing less than probable cause to arrest. Since, defendant contends, the facts known to Deputy Dugan at the time of the stop do not constitute probable cause for arrest, the initial identification and subsequent confession should have been suppressed.

Whether there was probable cause for arrest is a mixed question of law and fact. (*People v. McGowan* (1953), 415

Ill. 375, 380; *People v. Roberta* (1933), 352 Ill. 189, 193; 5 Am. Jur. 2d *Arrest* § 49 (1962).) The facts and circumstances of the stop and detention of the defendant were fully developed at the hearing on the motion to suppress and are uncontroverted. Although the trial court found only that Deputy Dugan had probable cause to stop and did not make a finding on the issue of probable cause to arrest, there appears to be no reason why the remaining question of law may not be determined here. (*Cf., People v. Kalpak* (1957), 10 Ill. 2d 411, 425-26 (where the question of defective warrant was avoided by finding that probable cause to arrest without warrant was established); see also *State v. Byers* (1975), 85 Wash. 2d 783, 539 P.2d 833.) The question here is a close one, but we believe that Deputy Dugan had probable cause to arrest the defendant and Long, for armed robbery, following the stop.

Probable cause for arrest exists when facts and circumstances within the arresting officer's knowledge are sufficient to warrant a man of reasonable caution in believing that an offense has been committed and that the person arrested has committed the offense. (*People v. Creach* (1980), 79 Ill. 2d 96, 101; *cert. denied* (1980), 449 U.S. 1010, 66 L. Ed. 2d 467, 101 S. Ct. 564; *People v. Robinson* (1976), 62 Ill. 2d 273; *People v. Clay* (1973), 55 Ill. 2d 501; see also *Brinegar v. United States* (1949), 338 U.S. 160, 93 L. Ed. 1879, 69 S. Ct. 1302; *Carroll v. United States* (1925), 267 U.S. 132, 69 L. Ed. 543, 45 S. Ct. 280.) Although a "mere suspicion" that the person arrested has committed the offense is an insufficient basis for arrest (see *Henry v. United States* (1959), 361 U.S. 98, 4 L. Ed. 2d 134, 80 S. Ct. 168; *Mallory v. United States* (1957), 354 U.S. 449, 1 L. Ed. 2d 1479, 77 S. Ct. 1356), evidence sufficient to convict is not required (*People v. Marino* (1970), 44 Ill. 2d 562, 573; *People v. Macias* (1968), 39 Ill. 2d 208, 213, *cert. denied* (1969), 393 U.S. 1066, 21 L. Ed. 2d 709, 89 S. Ct. 721; *People v. Fiorito* (1960), 19 Ill. 2d 246, 253, *cert. denied* (1960), 364

U.S. 870, 5 L. Ed. 2d 93, 81 S. Ct. 113).

Because, as Professor LaFave points out in his treatise on the law of search and seizure, an arrest not only serves the function of producing persons for prosecution but also serves an investigative function, courts have not ruled that an arrest can occur only when the known facts indicate that it is more probable than not that the suspected individual has committed the crime. (1 W. LaFave, Search and Seizure § 3.2, at 478-85 (1978), noting in particular the position taken in the Model Code of Pre-Arraignment Procedure 14 (Proposed Official Draft 1975).) Professor LaFave also suggests that a "more probable than not" test might be more appropriate if the question was whether the officer knew that a crime had been committed:

> "[T]he probable cause test is a 'compromise' for accommodating the 'often opposing interests' of privacy and law enforcement. The compromise might well be struck somewhat differently in cases where the uncertainty is whether any crime has occurred, for it appears that the privacy and law enforcement interests ought to be weighed somewhat differently in that context. For one thing, it would seem that privacy is threatened less by permitting less than a 50% probability as to the identity of an offender than it is by permitting something short of more-probable-than-not as to the existence of criminal activity. As to the former, the existence of known criminal activity serves to provide an anchor or touchstone, in a time-space sense, which limits the police arrest authority. Police will not continually be arresting upon a less than 50% probability of guilt, but only in limited situations where a person is found in an area where it is known a crime has recently occurred. By contrast, if the police may also arrest upon a less than 50% probability that a crime has even occurred, then this would open up the possibility that police would generally arrest persons engaged in activity which was only equivocal. The latter practice, it seems fair to assume, would result in

many more intrusions into the freedom and privacy of innocent persons than would the former.

By the same token, the law enforcement need for allowing arrests upon a less than 50% probability of crime is not as great as the need to permit arrests upon a less than 50% probability that the arrestee is the person who committed a known crime. As discussed earlier, the latter situation commonly involves police action taken in response to a recent serious crime, such as murder, armed robbery or burglary, where experience has shown that the chances of apprehending the offender are slight unless he is caught in the vicinity of the crime." 1 LaFave, Search and Seizure § 3.2, at 484-85 (1978).

At the time Deputy Dugan stopped defendant's car he knew that an armed robbery had recently been committed. He was provided with a description of the robbers, and, immediately, within 30 to 35 minutes of the robbery, began to search the area for the robbers. Although some of the descriptions given by the victims were rather general, the rural area surrounding the small community of Liverpool was sparsely populated (Deputy Dugan referred to it as "desolate"), the Liverpool road was lightly traveled (defendant's car was the only one seen by Dugan on the road), and it was late at night. Under these circumstances, the number of individuals in that area who might be expected to fit these descriptions, particularly the blue-jacket and bushy-hair portions, was sufficiently limited to avoid arbitrary or wholesale arrests. *Cf., Commonwealth v. Jackson* (1975), 459 Pa. 669, 331 A.2d 189, and *Commonwealth v. Richards* (1974), 458 Pa. 455, 327 A.2d 63, where general descriptions in more populated areas were held too general to support arrest; see also *Wong Sun v. United States* (1963), 371 U.S. 471, 9 L. Ed. 2d 441, 83 S. Ct. 407, and *Mallory v. United States* (1957), 354 U.S. 449, 1 L. Ed. 2d 1479, 77 S. Ct. 1356, where the general nature of information available to arresting officers was held to be insufficient.

Deputy Dugan testified that he was searching for one to four young, white males who would fit the descriptions. Both defendant and Long fit them reasonably closely. Defendant was also in the area of the robbery within a short time after its occurrence. Although defendant argues that this fact cuts against the existence of probable cause, in that robbers would be expected to be far away 30 minutes later, such a holding would require that searches for suspects take place only at the fringes of the area. Since there was no indication that the robbers were nonresidents of the area, it seems to us not illogical to expect that they might still be in the vicinity. While it is arguable that defendant had been coming from an unexpected direction, the fact remains that he was within the area in which a search could reasonably be conducted.

Clearly Deputy Dugan had sufficient cause to stop the car for investigative purposes, either on the grounds of his observation that its occupants seemed to match the descriptions he was given or that the car was without license plates. Upon a closer view of defendant, the deputy also observed that defendant matched the height description, and that Long, with his more distinctive bushy hair and blue jacket, fit the description rather well. The combination of two suspects, both fitting the descriptions, is another factor to be considered in determining the probabilities involved in the determination of "probable" cause. Under all of the circumstances present here we believe Deputy Dugan had probable cause to believe that defendant and Long were two of the robbers for whom he was looking. We hold, therefore, that defendant was constitutionally arrested when he was placed in the deputy's squad car and taken back to Riverview Inn.

While we have determined that probable cause to arrest existed at the time defendant was placed in the deputy's squad car, we also consider the transportation of the defendant the short distance involved here for purposes of a

showup to have been a legitimate investigatory procedure even if one considers the grounds to have been less than probable cause to arrest. The line of demarcation between a legitimate seizure of a suspect on less than probable cause in a *Terry* stop and an impermissible seizure, tantamount to a full-blown arrest on less than probable cause as described in *Dunaway v. New York* (1979), 442 U.S. 200, 60 L. Ed. 2d 824, 99 S. Ct. 2248, is not completely clear. It appears to us, as the State argues in this case, that a middle ground can exist wherein an investigatory procedure, such as an immediate showup, can be employed by officers acting on somewhat less than probable cause to arrest.

In *Terry v. Ohio* (1968), 392 U.S. 1, 20 L. Ed. 2d 889, 88 S. Ct. 1868, *Sibron v. New York* (1968), 392 U.S. 40, 20 L. Ed. 2d 917, 88 S. Ct. 1889, and *Adams v. Williams* (1972), 407 U.S. 143, 32 L. Ed. 2d 612, 92 S. Ct. 1921, the Supreme Court carved out a limited exception to the fourth amendment requirement that seizures of persons be based upon probable cause. Although much of the court's concern in these cases was with the scope of a search of the person incidental to the stop, it was recognized that the purpose of the stop itself was to investigate the "articulable suspicions" of the officer that the person stopped had committed or was about to commit a crime. (*Terry v. Ohio* (1968), 392 U.S. 1, 22-23, 30, 20 L. Ed. 2d 889, 907, 911, 88 S. Ct. 1868, 1880-81, 1884; see 3 W. LaFave, Search and Seizure § 9.2 (1978).) In many cases following *Terry,* courts refused to limit investigative technique to simple questioning of the suspect, but rather recognized that legitimate, efficient police work, under certain circumstances, might require either detention until witnesses could arrive who might provide positive identification or transportation of the suspect to those witnesses. (See, *e.g.,* cases collected at 3 W. LaFave, Search and Seizure § 9.2, at 44 n.93 (1978); see also *United States v. Nieves* (2d Cir. 1979), 609 F.2d 642; *United States v. Esposito* (E.D. New York 1980), 484 F.

Supp. 556; *Commonwealth v. Lovette* (1979), 271 Pa. Super. 250, 413 A.2d 390; but see *People v. Harris* (1975), 15 Cal. 3d 384, 540 P.2d 632, 124 Cal. Rptr. 536.) The rationale of these cases was, apparently, that a short period of detention was only minimally intrusive when compared to the benefit of immediate investigation.

Defendant argues, however, that the decisions in *Davis v. Mississippi* (1969), 394 U.S. 721, 22 L. Ed. 2d 676, 89 S. Ct. 1394, *Brown v. Illinois* (1975), 422 U.S. 590, 45 L. Ed. 2d 416, 95 S. Ct. 2254, and *Dunaway v. New York* (1979), 442 U.S. 200, 60 L. Ed. 2d 824, 99 S. Ct. 2248, require probable cause to arrest before he may be transported from the site of the stop. In *Dunaway* the defendant was "picked up" on the strength of an informant's tip for questioning in regard to a robbery/murder that had taken place several months before. He was brought to police headquarters and interrogated. The court, in holding that he had been seized unlawfully on less than probable cause, rejected the State's argument that this police action was reasonable under the circumstances. In reaching this conclusion the court reviewed its holdings in both *Davis* and *Brown,* concluding:

"[C]ustodial interrogation—regardless of its label—intrudes so severely on interests protected by the Fourth Amendment as necessarily to trigger the traditional safeguards against illegal arrest. We accordingly hold that the Rochester police violated the Fourth and Fourteenth Amendments when, without probable cause, they seized petitioner and transported him to the police station for interrogation." (442 U.S. 200, 216, 60 L. Ed. 2d 824, 838, 99 S. Ct. 2248, 2258.)

See Comment, *Custodial "Seizures" and the Poison Tree Doctrine: Dunaway v. New York and its Aftermath,* 13 J. Marshall L. Rev. 733, 748 (1980), concluding, in part, that the court thus rejected "*any* standard short of probable cause for an involuntary custodial interrogation, no matter how exceptional the circumstances."

The court has quite clearly held that in the context of

the police activity in *Dunaway, Brown* and *Davis* probable cause *is* the balance between society's interest in catching criminals and the individual's liberty interest. However, in the case before us, we are presented with police conduct, substantially less intrusive than that in *Dunaway* and *Brown* and in a markedly different context. In *Dunaway, Brown* and *Davis* the seizure occurred long after the crime. Deputy Dugan, in contrast, was conducting a field investigation within just a few minutes of the crime. The stop of defendant occurred no more than 35 minutes after the robbery and very close to the scene of the crime. In the context of the time and place of the stop, late night on a virtually deserted country road, considering that both defendant and his passenger fit the descriptions given him by the victims, considering that simple questioning was inadequate to produce further information, considering that the victims, who were only a few minutes away, could immediately confirm or deny the identification of the suspects as the robbers, and, perhaps most importantly in view of *Terry* and *Dunaway*, considering that the transportation of defendant to the inn was not significantly more intrusive upon his liberty than detaining him to await arrival of the victims, we believe that the circumstances are much closer to those of a permissible stop under *Terry* and *Adams* than the impermissible station house, custodial questioning tantamount to a full blown arrest in *Brown* and *Dunaway*.

Faced with what appears to be a hard rule of probable cause in *Dunaway*, several Federal courts have refused to approve anything more than a *Terry*-stop absent probable cause. However, most of those cases differ, in important respects, from ours. In *United States v. Chamberlin* (9th Cir. 1980), 644 F.2d 1262, a 20-minute detention in a police car was held to exceed permissible limits; significantly, however, although the stop was valid under *Terry*, the police had only suspicions that a crime had been committed. *United States v. Tookes* (5th Cir. 1980), 633 F.2d

712, held that detention while officers searched for evidence of crime based only on suspicious activity of suspect was an impermissible arrest. *United States v. Hill* (5th Cir. 1980), 626 F.2d 429, held that a seizure based only on an anonymous tip that a drug deal was being made, where the defendant fit the description given by the informant, was an impermissible seizure under *Dunaway; United States v. Tucker* (2d Cir. 1979), 610 F.2d 1007, held that detention in a "holding pen" for several hours where the defendant was picked up as a suspect in a bank robbery the day after crime was impermissible under *Dunaway. United States v. Perez-Esparza* (9th Cir. 1979), 609 F.2d 1284, held that holding a suspect for three hours at a border checkpoint based on an informant's tip that he was carrying drugs was a violation of *Dunaway. United States v. Williams* (8th Cir. 1979), 604 F.2d 1102, held that probable cause was necessary to take the defendant to the police station.

More recently, however, the apparently hard rule of *Dunaway* that seizures of persons be supported by probable cause was softened somewhat in *Michigan v. Summers* (1981), 452 U.S. 692, 69 L. Ed. 2d 340, 101 S. Ct. 2587. There defendant was detained by police upon grounds less than probable cause, while they searched a house for narcotics pursuant to a search warrant. The court found this detention was substantially less intrusive than that of *Dunaway.* Significantly, the court, in reviewing its holdings in *Terry, Adams* and other "stop" cases, noted: "In these cases, as in *Dunaway,* the Court was applying the ultimate standard of reasonableness embodied in the Fourth Amendment. * * * [T]hey demonstrate that the exception for limited intrusions that may be justified by special law enforcement interests is not confined to the *momentary, on-the-street detention* accompanied by a frisk for weapons involved in *Terry* and *Adams.*" (Emphasis added.) 452 U.S. 692, 699-700, 69 L. Ed. 2d 340, 348, 101 S. Ct. 2587, 2592-93.

In addition, cases from other jurisdictions, on facts

much closer to those here, which have approved similar police conduct. In *State v. Fauria* (La. 1981), 393 So. 2d 688, a detention of suspects at the site of the stop to await arrival of policeman who could identify suspected stolen goods was held a reasonable investigatory stop. In *State v. Merklein* (Fla. App. 1980), 388 So. 2d 218, a detention of the defendant for 20 to 40 minutes pending the arrival of robbery victims and witnesses, where the stop occurred soon after the robbery, was held to be reasonable without citing either *Terry* or *Dunaway*. In *District of Columbia v. M.M.* (D.C. App. 1979), 407 A.2d 698, where defendants fitting descriptions of robbers were stopped 25 minutes after a robbery, a short transportation for a showup to eyewitness was held not to be an unreasonable intrusion. (See also *Wilkerson v. United States* (D.C. App. 1981), 427 A.2d 923.) In a recent update of the treatise, Professor LaFave suggests *Dunaway* does not rule out transportation of a suspect for purposes of a showup.

> "It may be said, of course, as to the situation presently under discussion, that again there is an additional circumstance not present in *Terry* or related cases decided by the Supreme Court under the balancing test: the suspect is not dealt with only at the place 'where he was found,' but instead is 'transported' elsewhere. But that alone, it is submitted, does not make the detention 'in important respects indistinguishable from a traditional arrest.' It is certainly much closer to a traditional stop under *Terry*, as the suspect is moved a short distance, is not confined in a police station, and is subjected to investigative techniques (almost always viewing by an eyewitness) with a high potential for promptly clearing or inculpating the suspect." 3 W. LaFave, Search and Seizure § 9.2, at 6 n.93.3 (1981 Supp.).

In many, if not most, of the cases in which *Dunaway* has been cited as controlling the decision to hold impermissible certain investigative activities short of custodial interroga-

tion, the stop by police occurred before they knew that a crime had been committed. As Professor LaFave suggests is appropriate, courts have been more protective of individual liberty interests where it is not known that a crime has been committed than where the stop occurs during the period of an immediate investigation of a known crime. This distinction appears to be sound. We do not believe that the court in *Dunaway* intended to eliminate effective and only minimally intrusive investigative techniques employed by police in the immediate search for the perpetrators of serious crime. In *Adams v. Williams,* Justice Rehnquist, speaking for a majority of the court, said:

> "The Fourth Amendment does not require a policeman who lacks the precise level of information necessary for probable cause to arrest to simply shrug his shoulders and allow a crime to occur or a criminal to escape. On the contrary, *Terry* recognizes that it may be the essence of good police work to adopt an intermediate response." (407 U.S. 143, 145, 32 L. Ed. 2d 612, 616-17, 92 S. Ct. 1921, 1923.)

As the court noted in *Mapp v. Ohio* (1961), 367 U.S. 643, 657, 6 L. Ed. 2d 1081, 1091, 81 S. Ct. 1684, 1693, "[t]here is no war between the Constitution and common sense." We believe that common sense approves, and the fourth amendment does not condemn, the actions of Deputy Dugan, regardless of the existence of probable cause.

Nor do we believe that section 107—14 of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1979, ch. 38, par. 107—14), which codified *Terry* (*People v. Lee* (1971), 48 Ill. 2d 272, 279), prohibits the limited transportation of this defendant for the showup purposes. In the sparsely populated rural area where defendant was stopped late at night, the Riverview Inn, two to three miles away, was in our opinion within "the vicinity" of the stop as that phrase was legislatively intended. Similarly, the few minutes required for transportation there did not prolong the stop beyond the "reasonable period of time" permitted by the statute.

It remains to be decided whether the showup identification was admissible. This court has approved prompt showups near the scene of the crime as acceptable police procedure designed to aid police in determining whether to continue or to end the search for the culprits. (*People v. McKinley* (1977), 69 Ill. 2d 145, *cert. denied* (1978), 435 U.S. 975, 56 L. Ed. 2d 69, 98 S. Ct. 1623; see also *People v. Bey* (1972), 51 Ill. 2d 262; *People v. Higgins* (1972), 50 Ill. 2d 221, *cert. denied* (1972), 409 U.S. 855, 34 L. Ed. 2d 100, 93 S. Ct. 195; *People v. Elam* (1972), 50 Ill. 2d 214.) The admissibility of the evidence of a showup identification depends upon the reliability of that identification. (*Manson v. Brathwaite* (1977), 432 U.S. 98, 53 L. Ed. 2d 140, 97 S. Ct. 2243; *People v. McKinley* (1977), 69 Ill. 2d 145.) Applying to the showup at the Riverview Inn the factors suggested in *Manson* and *McKinley*, we find that during the course of the robbery Mrs. Morse was out of her car, talked to the robbers and had ample time to view defendant and others for a period of several minutes. Mr. Morse, although he was seated in the back seat of the car, also had ample opportunity to view the defendant before the robbery and had a much closer view when defendant held the rifle just a few inches from his head. The Morses appear to have been attentive to the robbers and provided an initial description that, although concededly somewhat general as to some, was reasonably accurate. Mrs. Morse, who came out of the Inn first and alone, promptly and positively identified defendant as the robber. Additionally she volunteered the information about the cut finger which was verified by Deputy Dugan's inspection of defendant's hands. Mr. Morse came out after this, and, immediately, apparently without talking to his wife, identified defendant as the person who held the rifle. A relatively short time, no more than 55 minutes, had elapsed between the robbery and the showup. In view of these factors we are satisfied that the showup identifications were sufficiently reliable to permit them to be introduced

as evidence. Given the validity of the arrest and the admissibility of the showup identifications as evidence, there is no question that the in-court identification of defendant was also properly admitted. See, *e.g., United States v. Crews* (1980), 445 U.S. 463, 63 L. Ed. 2d 537, 100 S. Ct. 1244.

Accordingly, we find no error in the proceedings of the trial court. The judgment of the appellate court is reversed, and the judgment of the circuit court of Fulton County is affirmed.

*Appellate court reversed;*
*circuit court affirmed.*