THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. LANCE NORRIS, Defendant-Appellant.

First District (6th Division)   No. 1—96—3015

Opinion filed February 5, 1999.

164

O'Hagan, Smith & Amundsen, L.L.C., of Chicago (Cheryl Warzynski and Michael Resis, of counsel), for appellant.

Richard A. Devine, State's Attorney, of Chicago (Renee Goldfarb, James Fitzgerald, and Kenneth Fiedler, Assistant State's Attorneys, of counsel), for the People.

PRESIDING JUSTICE CAMPBELL delivered the opinion of the court:

Following a jury trial in the circuit court of Cook County, defendant Lance Norris was found guilty of armed robbery, armed violence and aggravated battery. The trial court sentenced defendant to life imprisonment on the convictions for armed robbery and armed violence, pursuant to the Habitual Criminal Act (720 ILCS 5/33B—1 et seq. (West 1996)). Defendant also received a concurrent five-year sentence for aggravated battery. Defendant now appeals his conviction.

The record on appeal indicates the following facts. Defendant was arrested on August 13, 1991. Defendant states in his brief that "[c]oncurrently, at least five other cases were pending against him." The indictment in this case, number 91—22465, is file stamped September 24, 1991. The State was granted leave to file the indictment on October 2, 1991. The State originally elected to proceed on a separate case before Judge Mahon. While the State proceeded on the separate case, this case was continued on more than 20 occasions.

On September 9, 1993, defendant filed a motion to quash arrest and suppress evidence in this case. On November 23, 1993, the trial court held a hearing on the matter. Chicago police officer Anthony

Powell testified that during the early morning hours of August 13, 1991, he and his partner, Officer Greg Reynolds, stopped defendant for a traffic violation at the 5900 block of North Broadway. Officer Powell testified that the car Norris was driving was dark blue and had no license plates, though it had a "license applied for" sticker in the window.

Defendant produced his driver's license to the police, but chose to go to the 24th District police station to post a cash bond, rather than have his license confiscated.

Officers Powell and Reynolds were assisted during the traffic stop by Officer William Ruck and his partner. Officer Ruck testified that, prior to beginning his shift at midnight on the date in question, he had been informed by the watch commander during roll call that several armed robberies had recently occurred in the area during the first watch. The perpetrators were generally described as two male African-Americans, armed with handguns and driving a black automobile.

Officers Powell and Ruck testified that Norris had a passenger in the car named Ronald Selvage, who exited the vehicle during the traffic stop. Selvage appeared to be holding an object in the waistband of his jogging pants by pressing his arm against it. Officer Ruck asked Selvage to put his arms away from his body. Officer Ruck saw an object travel down Selvage's pant leg and heard a "thump" when the object hit the ground.

Officer Ruck then recovered the object, a .38-caliber revolver. The gun was loaded but had one spent round. Selvage was then arrested for the unlawful use of a weapon and taken to the 24th District police station. Defendant posted a cash bond for the traffic violation at the 24th District police station, then left. Selvage remained at the police station. Officer Reynolds testified at trial that defendant said he would return to the police station to post bond for Selvage.

After defendant left the police station, Officer Ruck pulled case reviews from the past several days. One of the police reports covered an armed robbery of a gas station at 6000 North Western, which had occurred within the prior two weeks. The report described three perpetrators who appeared to be less than 30 years old, with two handguns, driving a dark blue or black automobile without license plates.

Officer Ruck then spoke with Officer Reynolds, who told him about a telephone call Officer Reynolds made to the Skokie police department. Officer Reynolds had telephoned the Skokie police department because he had tried to buy gasoline for his car the prior afternoon at a gas station on Touhy Avenue but was blocked from entry by crime scene tape. Officer Reynolds was told that there had been an armed

robbery at the gas station and that what appeared to be a .38-caliber bullet was fired into the counter.

Officer Ruck testified that he was told by Officer Reynolds of the armed robbery. Officer Ruck estimated that the gas station was six or seven miles away from the police station. According to Officer Ruck, Officer Reynolds had received a description of the offender as an African-American male, approximately 6 feet tall, weighing approximately 210 pounds, with short cropped hair. This description was corroborated by the testimony of Skokie police officer Thomas Nelis. Officer Ruck testified that defendant was approximately 6 feet tall and had short cropped hair at the time of the traffic stop. Officer Ruck used the information obtained from defendant during the traffic stop to check whether defendant had a criminal history. Defendant had prior convictions for rape and armed robbery.

Officer Ruck further testified that defendant returned to the 24th District police station approximately 20 to 30 minutes after he left. Officer Reynolds testified that defendant was arrested on suspicion of armed robbery at that time. Officer Reynolds testified that he prepared a report in this case but did not mention his telephone call to the Skokie police department in that report. The trial court denied defendant's motion to quash and suppress. Defendant filed a motion to reconsider, which the trial court also denied.

On December 3, 1993, Judge Mahon set one of defendant's cases for trial on December 7, 1993. The transcript of the proceedings in that case indicates that the State represented that it had "elected the case in the suburbs," whereupon Judge Mahon stated that "[y]ou're not going to elect the case in the suburbs. I have told you that on the record fourteen times. This case is going to trial on the date I have set." Defense counsel stated that he would not be ready, to which Judge Mahon replied, "Sorry. You're going to be ready." However, later in December 1993, the State changed its election and proceeded in this case; the cases pending before Judge Mahon were apparently transferred to the trial judge in this case.

This case was then continued on numerous occasions. On January 9, 1995, defendant moved to dismiss, arguing that the State was in violation of section 103—5 of the Code of Criminal Procedure (the Speedy Trial Act) (725 ILCS 5/103—5 (West 1996)). On April 21, 1995, the trial court heard defendant testify that, in August 1991, he was represented by private counsel, but that attorney was discharged in 1992. Defendant was then assigned to the public defender, where he was represented by two attorneys. The record indicates that the public defenders later became the subjects of a pending Attorney Registration and Disciplinary Committee complaint regarding this case. Defen-

dant was again represented by private counsel. The hearing was continued to May 4, 1995; the motion to dismiss was denied on that date.

The case proceeded to trial on June 6, 1995. Rosemary Spizzirri, the manager of a Citgo gas station at 5343 West Touhy in Skokie, Illinois, testified that on August 12, 1991, at approximately 10 a.m., she and a cashier named Jane Yacoub were working at the station. It was a sunny day. There was artificial lighting inside the station.

Spizzirri testified that an African-American male, approximately 6 feet tall and weighing approximately 200 pounds, entered the station carrying a small briefcase. The man told Yacoub that "this is a robbery." Spizzirri stated that Yacoub seemed to be in shock. Spizzirri pushed Yacoub aside and asked the man to repeat himself. The man repeated that "this is a robbery" and pulled a gun out of the briefcase. Spizzirri was standing approximately a yard from the man.

Spizzirri told the man that she did not think he had a real gun, whereupon the man fired a shot through the side of the counter into the office door. The man then reached over the counter, pressed a button to open the cash register, and began to take money out of the drawer. Spizzirri slammed the cash drawer on the man's fingers. The man then struck Spizzirri in the left side of her face with the gun. The man went around to Spizzirri's side of the counter to retrieve more money kept under the counter. The man again struck Spizzirri in the side of her face with the gun. The man unsuccessfully attempted to open the gas station's safe, then left the premises.

Spizzirri testified that the police arrived a few minutes later. Spizzirri described the offender to the police and told them that he had opened the register. Spizzirri was taken by paramedics to the hospital for treatment of a cut, which required seven stitches, and a blood clot in her eye.

Approximately one week after the robbery, the police showed Spizzirri an array of photographs, from which she identified defendant as the offender. She also identified defendant in a lineup conducted on August 29, 1991. Spizzirri identified defendant in court as well.

On cross-examination, Spizzirri testified that she did not know Yacoub's whereabouts. Spizzirri also testified that she did not know the whereabouts of a man named Mr. Lee, who had walked into the gas station during the robbery.

Officers Reynolds and Ruck gave testimony regarding defendant's arrest that was substantially similar to their testimony at the hearing on the motion to quash and suppress. Officer Reynolds added that defendant had been driving a dark-colored, four-door Chevy Caprice. On cross-examination, Officer Reynolds testified that he never saw defen-

dant touch the gun recovered from Selvage and never had the gun or bullets tested for fingerprints. Officer Reynolds did not know how recently the gun had been fired but did discover that the gun was stolen. Officer Ruck testified that he did not have the gun tested for fingerprints or to determine how recently it had been fired.

Skokie police officer Steven Anton, an evidence technician, testified that on August 12, 1991, he arrived at the gas station at approximately 10:45 a.m. to process the crime scene. Officer Anton recovered a .38-caliber bullet from the room behind the office door but could not find a bullet casing, which indicated to Officer Anton that the bullet had been fired by a revolver. Officer Anton packaged the bullet in a plastic container.

Officer Anton also dusted the scene for fingerprints. Officer Anton testified that he lifted seven latent fingerprints, several of which were taken from the cash register. The fingerprints were sent to the Federal Bureau of Investigation (FBI) laboratory in Washington, D.C., for analysis.

On cross-examination, Officer Anton stated that he did not dust the recovered bullet, the revolver or the unspent bullets for fingerprints. Officer Anton testified that he would not expect to get a good fingerprint lift from a spent bullet. However, according to Officer Anton, the unspent bullets and some parts of the gun could have provided a good lift.

Skokie police officer Robert Weick, a property custodian, testified regarding the chain of custody of the gun, bullets and latent fingerprints.

Officer Nelis testified regarding his investigation of the gas station robbery. Officer Nelis took a description of the offender from Spizzirri. He later showed Spizzirri the array of photographs and conducted the lineup from which Spizzirri identified defendant. However, Officer Nelis did not show the gun recovered from Selvage to Spizzirri. Officer Nelis stated that he had no idea how many .38-caliber guns there were in the Chicagoland area, but estimated that there could be between 1 and 10,000. The recovered bullet was subjected to a ballistics test, but due to the condition of the bullet, the firearms examiner could not determine whether it came from the gun recovered from Selvage.

Barbara Pase, who worked for the laboratory division of the FBI, testified as a fingerprint expert. Pase testified that she compared the latent fingerprints taken from the gas station to defendant's fingerprints. Pase opined that one of the latent fingerprints, which was recorded as "cash register drawer front," had 15 points of identity with defendant's left thumbprint. Pase testified that these two

fingerprints were the same and could not have been made by any other individual. The State rested its case.[1]

On June 8, 1995, during the jury instruction conference, defense counsel stated that he wanted to make sure that the State had turned over all the *Brady* material relating to Jane Yacoub. The State indicated that "every bit" of the *Brady* material had been turned over to the defense.

Following closing arguments, jury instructions and deliberations, the jury found defendant guilty of armed robbery, armed violence and aggravated battery.

On July 27, 1995, defendant filed a motion for a new trial, supported in part by the affidavit of Jane Hanna, formerly Jane Yacoub. In her affidavit, Hanna stated that she had been unable to identify anyone as the offender in a lineup at the Skokie police station. While this case was pending, Jane had married and moved her residence. According to Hanna's affidavit, on or about May 1, 1995, the State came looking for her at her husband's place of employment. Hanna spoke with State investigators in mid May 1995 and met with State's Attorneys and police officers on June 5, 1995, stating that she could not recognize anyone from the lineup or photographs. As she left the meeting, Hanna gave the prosecutors her pager number.

On August 21, 1995, the trial court granted defendant's motion for a new trial, based solely on the State's failure to disclose Hanna's pager number and misleading statements made to the defense regarding Hanna's whereabouts.

The State moved to have the trial court reconsider its ruling on the motion for new trial and reinstate the conviction. At a hearing on the matter, Hanna testified that she had known Sandy Hamzo for 23 years and spoke with her two or three times per week. The record shows that Hamzo was a secretary of the defense attorney. In June 1995, Hamzo had Hanna's home telephone and pager numbers. Hanna testified that she met with the State's Attorneys on June 5, 1995. According to Hanna, Hamzo "gave [her] a call about [S]tate's [A]ttorneys" on June 6 or 7, 1995. Hanna also stated that she spoke with defendant's attorney on June 7, 1995, about giving an affidavit in defendant's case.

Hanna further testified that she went to the office of defendant's attorney on June 7, 1995, and signed an affidavit with the date left

---

[1]Defendant also presented several witnesses on his behalf. However, defendant does not refer to them in the "Statement of Facts" in his brief. As the testimony of the defense witnesses does not appear to relate to the claims defendant raises on appeal, it seems unnecessary to summarize their testimony.

blank. After Hanna signed the affidavit, defendant's attorney asked her whether she would come to court. Hanna replied that she would come to testify. According to Hanna, defendant's attorney said that he would contact her through Hamzo. Hanna testified that defendant's counsel gave her affidavit to another of his secretaries, who Hanna identified as "Bonnie," mentioning to the secretary to "put like month for later for the date." Hanna also testified that she gave defense counsel her pager number at that time.

On cross-examination, Hanna admitted that she had told the State that Hamzo had called her from defense counsel's office. The State stipulated that defense counsel's office telephone records did not show a call to Hanna during the relevant time frame. Hanna did not remember whether she had been in defense counsel's office on June 5, 9, 13 or July 5, 1995.

Hamzo testified that she had been working for defendant's counsel since 1990. Hamzo stated that she did not become aware that defense counsel was looking for Hanna until June 7, 1995, when counsel was discussing the case after returning from court. Hamzo told her employer that she had been friends with Hanna for many years. Hamzo testified that she called Hanna on June 9, 1995, and did not recall telephoning Hanna on June 7, 1995. Hamzo made the telephone call at defense counsel's request; he did not ask her to call Hanna on June 7 or 8, 1995.

Hamzo testified that Hanna signed the affidavit on July 5, 1995, but admitted that she did not see Hanna sign the affidavit. Hamzo noted that the office telephone records showed four calls to Hanna on July 5, 1995. Hamzo stated that she made those telephone calls. Based on office computer records, Hamzo testified that she created the affidavit on June 27, 1995.

Bonnie Vasaloski testified that she had been working for defense counsel for the prior 12 years. Vasaloski testified that defendant's attorney asked her to step into the office when Hanna signed the affidavit. Vasaloski, a notary, then signed and notarized the affidavit.

On June 17, 1996, the trial court reversed its ruling on the motion for new trial and reinstated defendant's conviction. The trial court sentenced defendant to life imprisonment on the convictions for armed robbery and armed violence, pursuant to the Habitual Criminal Act. Defendant also received a concurrent five-year sentence for aggravated battery. Defendant now appeals.

I

■ Defendant first contends that the trial court erred in denying the motion to quash and suppress because he was arrested without

probable cause. Whether probable cause to arrest exists in a case is based on the totality of the circumstances. *People v. Tisler*, 103 Ill. 2d 226, 469 N.E.2d 147 (1984). Probable cause exists if the police know of facts that would lead a reasonable person to believe that a crime has been committed by the defendant. *People v. Neal*, 111 Ill. 2d 180, 489 N.E.2d 845 (1985). A finding of probable cause will not be reversed unless it is manifestly erroneous. *People v. Evans*, 125 Ill. 2d 50, 71, 530 N.E.2d 1360, 1368 (1988).

■ Defendant argues that he was arrested based on mere generalities and his "fortuitous association with Selvage." While a general description of an offender is insufficient in itself to provide probable cause for arrest, it may be a basis for probable cause when coupled with other relevant facts and circumstances known to the police. See *People v. Lippert*, 89 Ill. 2d 171, 180-81, 432 N.E.2d 605, 609 (1982).

■ In this case, defendant was arrested when he returned to the police station to post bond for Selvage. At that time, the police were aware of early morning armed robberies that had occurred recently in the area. The offenders were generally described as two male African-Americans, armed with handguns and driving a black automobile. One report described three perpetrators who appeared to be less than 30 years old, with two handguns, driving a dark blue or black automobile without license plates. The police also had a detailed description of an offender in an armed robbery occurring the prior day, six or seven miles from the area, that involved the firing of a .38-caliber bullet. Defendant, who resembled this last description, had been stopped in the early morning in the area where most of the robberies occurred, driving a car that generally matched the car described in the other robberies. Defendant's passenger carried a .38-caliber gun with one fired round.

■ Given this information, the trial court's denial of the motion to quash and suppress was not manifestly erroneous.[2] Defendant argues in passing that the evidence obtained as a result of the arrest was improperly admitted at trial, but cites no authority in support of this argument, which was not raised in his posttrial motion. Thus, the argument is waived on appeal.

## II

■ Defendant next contends that the trial court erred in failing to

---

[2]We also note in passing that defense counsel conceded at oral argument that the police had at least a reasonable suspicion regarding defendant. *Lippert* suggests that the police would have been justified in detaining defendant for a reasonable time to determine whether he could be identified as the offender in the robberies under investigation. See *Lippert*, 89 Ill. 2d at 182-87, 432 N.E.2d at 610-12.

declare a mistrial or to vacate his conviction based on the State's rebuttal argument that if defense counsel thought that Ms. Yacoub or Mr. Lee could have helped defendant's case, they would have been subpoenaed and brought in to testify. Illinois courts allow a great deal of latitude to the State during closing and rebuttal argument. *People v. Williams*, 147 Ill. 2d 173, 231, 588 N.E.2d 983, 1005 (1991). The State ordinarily may not comment unfavorably on the defense's failure to produce a witness, at least where it is not made clear that the witness was readily available to the defense, but not to the State in the exercise of ordinary diligence. *People v. Holman*, 103 Ill. 2d 133, 151, 469 N.E.2d 119, 128 (1984). However, such comments are generally permissible in responding to a defense argument commenting on the State's failure to call the witness. *Holman*, 103 Ill. 2d at 151, 469 N.E.2d at 128. The decision to grant or deny a mistrial rests within the sound discretion of the trial court. *E.g., People v. Suane*, 164 Ill. App. 3d 997, 1006, 518 N.E.2d 458, 464 (1987).

■ In this case, during closing arguments, defense counsel rhetorically asked why the State did not bring in Yacoub or Lee as witnesses. The State then responded during rebuttal argument that the defense could have subpoenaed these witnesses. Defendant claims that the State went too far because it implied that these witnesses would have hurt the defense, but this is not a necessary inference. The State's comment may equally suggest that the witnesses could not identify the defendant as the robber but could not exclude him as a suspect. Accordingly, the trial court did not err in failing to declare a mistrial or to vacate defendant's conviction.

## III

■ Defendant argues that he was denied due process of law because the State failed to disclose the whereabouts of Jane (Yacoub) Hanna after speaking with her on the first day of trial. The suppression of material evidence favorable to the accused by the State violates the constitutional guarantee of due process of law, regardless of the good faith or bad faith of the prosecution. *People v. Pecoraro*, 175 Ill. 2d 294, 305, 677 N.E.2d 875, 881 (1997). A defendant may show a violation of due process where the prosecution withheld exculpatory evidence within its possession or control and that evidence was material in the sense that there is a reasonable probability that the outcome of the trial would have been different had the evidence been presented to the jury. See *United States v. Bagley*, 473 U.S. 667, 87 L. Ed. 2d. 481, 105 S. Ct. 3375 (1985); *Brady v. Maryland*, 373 U.S. 83, 10 L. Ed. 2d 215, 83 S. Ct. 1194 (1963).

■ On appeal, the State properly admits that it should have turned

over its information regarding Yacoub. Prosecutors are subject not only to the constitutional command of cases such as *Bagley* and *Brady*, but also our supreme court's rules governing discovery in criminal cases and the Illinois Rules of Professional Conduct, which require timely disclosure of any information in its possession or control which tends to negate the guilt of the accused. 134 Ill. 2d R. 412(c); 145 Ill. 2d R. 3.8(b). Indeed, the prosecutor's duty to disclose exculpatory information is a continuing duty; where the information is discovered during trial, the trial court is also to be notified. 134 Ill. 2d R. 415(b). A prosecutor who willfully violates these duties is subject to sanctions by the court. 134 Ill. 2d R. 415(g)(ii). While the failure to comply with these requirements does not require a reversal absent a showing of undue prejudice, these discovery requirements are *mandatory*; the State is not free to disregard them. *People v. Robinson*, 157 Ill. 2d 68, 78, 623 N.E.2d 352, 357 (1993).

The State maintains that the information would not have affected the outcome of the trial. The record shows that Yacoub would have testified that she was unable to identify defendant as the robber. The record also shows that Spizzirri testified that Yacoub seemed to be in a state of shock when defendant announced the robbery and that Spizzirri had to push Yacoub out of the way to address the robber. The record further shows that Spizzirri identified defendant as the robber. Moreover, fingerprint expert Barbara Pase testified that one of the fingerprints lifted from the cash register matched defendant's left thumbprint.

■ Given this record, there is not a reasonable probability that Yacoub's testimony would have affected the outcome of the trial. Moreover, the record shows that the defense learned how to contact Yacoub during the trial but failed to ask for a continuance, adding support to the conclusion that the defendant did not suffer prejudice by the absence of Yacoub's testimony. See *People v. Young*, 263 Ill. App. 3d 627, 635 N.E.2d 473 (1994).

Accordingly, we conclude that the trial prosecutors in this case were lucky in two respects. First, the record supports the trial court's ruling that the prosecutorial misconduct in this case did not deprive defendant of a fair trial. But the people of the State of Illinois (including defendant) should not have the defendant's right to a fair trial or the public's interest in seeing that an armed robber be convicted turn on the circumstance that Yacoub's whereabouts were fortuitously discovered by the defense through counsel's secretary. Second, the prosecutors were lucky that it did not occur to the trial court to hold a hearing on whether any prosecutor should have been sanctioned in this case. Yacoub's testimony was quite unlikely to sway the trier of

fact, given the other evidence presented at trial. However, the aforementioned legal duties to disclose are imposed on the State to remove from prosecutors the power to decide what evidence the defense ought to present.

In sum, while the State's behavior was undeniably improper, the trial court did not err in reversing its order granting a new trial and in reinstating defendant's conviction in this case.

## IV

■ Finally, defendant contends that the trial court erred in denying his motion to dismiss based on violations of his statutory and constitutional rights to a speedy trial. Generally, under the Code of Criminal Procedure of 1963, a defendant in custody has the right to be tried within 120 days of being taken into custody. See 725 ILCS 5/103—5(a) (West 1994). Each delay is attributed to the party causing it. *People v. Sojak*, 273 Ill. App. 3d 579, 582, 652 N.E.2d 1061, 1064 (1995). Continuances requested or agreed to by defendant's counsel are properly attributable to the defendant, regardless of whether there is evidence in the record that counsel consulted with defendant on the matter. *People v. Bowman*, 138 Ill. 2d 131, 141-43, 561 N.E.2d 633, 639 (1990). Delays occasioned by the absence of defense counsel are attributable to the defendant. *People v. Scotti*, 131 Ill. App. 3d 571, 573, 475 N.E.2d 1097, 1099 (1985).

Defendant's brief lists numerous dates on which his case was continued and on which he was not present in the courtroom. However, defendant concedes in his brief that many of these continuances were entered by agreement. The record shows that 18 of the continuances listed by defendant were entered by agreement; defendant does not suggest that this record is inaccurate. Two other continuances granted in 1994 listed by the defendant were requested by his counsel. The remaining four continuances listed by the defendant (one of which is a duplicate from defendant's list of agreed continuances) were granted in the absence of both defendant and his counsel. Any delay caused by these continuances was attributable to the defendant.

The case was continued on October 2, 1991, to October 7, 1991, and from October 7, 1991, to October 11, 1991, by order of the court. These delays are not attributable to the defendant, but they do not violate the statutory 120-day period.

■ A claim based on a defendant's constitutional right to a speedy trial depends on an analysis of whether: (1) the pretrial delay was uncommonly long; (2) the government or the defendant is more to blame for the delay; (3) the defendant asserted his right in due course; and (4) the prejudice suffered by the defendant was a result of the delay.

See *Doggett v. United States*, 505 U.S. 647, 651, 120 L. Ed. 2d 520, 528, 112 S. Ct. 2686, 2690 (1992). The record shows that some of the delay in this case was caused by the State's change of election in the case it would pursue against defendant. However, defendant also changed counsel on more than one occasion while in custody, which resulted in delay while new counsel became familiar with the status of defendant's cases. While the delay made it difficult for the defense to locate Yacoub as a witness, the record shows that defense counsel learned that he could contact her during the trial. Defendant was not prejudiced by the delay, given the evidence in this case.

Defendant also claims ineffective assistance of counsel for failure to move for a discharge based on his speedy trial rights. However, the transcripts and common law record show that defense counsel raised the speedy trial issue in this case by a motion heard on January 9, 1995, and denied on May 4, 1995. Defendant is mistaken in his belief that counsel failed to raise the issue. Moreover, the above discussion demonstrates that defendant would not have been prejudiced had counsel failed to raise the claim.

For all of the aforementioned reasons, the judgment of the circuit court of Cook County is affirmed.

Affirmed.

ZWICK and QUINN, JJ., concur.