163 Ill. App.3d 877 (1987)
516 N.E.2d 1326
In re J.C., a Minor (The People of the State of Illinois, Petitioner-Appellee,
v.
J.C., Respondent-Appellant).
No. 2-86-0765.
Illinois Appellate Court  Second District.
Opinion filed December 3, 1987.
*878 *879 *880 G. Joseph Weller and Francine Harrison, both of State Appellate Defender's Office, of Elgin, for appellant.
Dallas C. Ingemunson, State's Attorney, of Yorkville (William L. Browers and David A. Bernhard, both of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.
Judgment affirmed.
JUSTICE HOPF delivered the opinion of the court:
A petition for adjudication of wardship was filed against the minor-respondent, J.C., on July 1, 1986, alleging that the respondent had committed the offenses of residential burglary (Ill. Rev. Stat. 1985, ch. 38, par. 19-3(a)) and theft (Ill. Rev. Stat. 1985, ch. 38, par. 16-1(a)(1)). Thereafter, respondent filed a motion to quash arrest and suppress evidence, asserting that the arresting officer had no probable cause to believe that a crime had been committed or that respondent had committed a crime. Additionally, the respondent moved to suppress statements made to a police officer during an interrogation. Both motions were heard on the same dates as the adjudicatory hearing, July 11 and 15, and were denied. Following the adjudicatory hearing and the subsequent dispositional hearing, respondent was adjudicated delinquent, made a ward of the court, and sentenced to the Department of Corrections, Juvenile Division.
Respondent now appeals, contending that: (1) the trial court erred in denying respondent's motion to quash arrest as the police lacked probable cause to arrest the respondent; (2) the trial court abused its discretion in committing the respondent to the Department of Corrections; (3) the trial court committed plain error by conducting a joint dispositional hearing wherein both respondent and corespondent were *881 evaluated; and (4) the respondent was denied effective assistance of counsel due to a conflict of interest created by counsel's dual representation of respondent and corespondent.
That testimony at the hearing on respondent's motions to quash arrest and suppress statements and on the petition for adjudication of wardship showed that on June 28, 1986, at about 6 p.m., Fred Rippo of 18 Sedgewick, Oswego, Illinois, observed two male youths running through an open field behind his residence. At about 6:15 p.m., Rippo saw the same two youths walking back through the field. One youth was carrying a "large electronical object" which he laid down and then picked up again, carrying it another 20 or 30 feet, before Rippo heard the other youth say, "Drop it, we'll come back later to pick it up." The youth carrying the object dropped it, and both youths left, going northbound down Boulder Hill Pass. At the same time Rippo observed a couple of patrol cars traveling down Boulder Hill Pass. Rippo kept a watch on the area where he had seen the youths. Eventually, he went into the field to that area and observed a video cassette player lying on the ground. Rippo returned to his house and notified the Oswego police department.
Officer Steven Plock of the Oswego police department testified that at approximately 6 p.m. he was on routine patrol on Boulder Hill Pass going northbound when he noticed a southbound vehicle traveling at a slow pace. The occupants of the car were looking into an open field to the west of the road. Officer Plock finished his patrol and was then proceeding southbound on Boulder Hill Pass when he again observed the same vehicle traveling northbound at a slow pace. The occupants were looking into the open field. At that time, the officer also looked into the field and saw the respondent and either the corespondent or his twin brother walking towards Boulder Hill Pass. The officer stated that he knew respondent by sight.
Later, at about 7:30 p.m., Officer Plock was dispatched to the residence of Fred Rippo. Rippo told the officer about his observations of the two youths, about overhearing their conversation, and about his subsequent investigation of the field area and discovery of the VCR. Rippo's descriptions of the youths corresponded with Officer Plock's observations of the respondent and the corespondent. Plock elected to remain in Rippo's backyard and watch the field until he obtained some assistance with his surveillance.
Subsequently, Officer Kenneth Hester was dispatched to the Rippo residence. Officer Plock advised Hester of Rippo's observations and subsequent discovery in the field. It was decided that a stakeout would be set up. At about 9 p.m., Officer Hester proceeded to a *882 nearby location to watch the field while Officer Plock went back to the police department to get a flashlight, radio, and binoculars.
A short time later a black Lincoln Continental pulled up to the area of Boulder Hill Pass. From his stakeout position, Officer Hester observed two male subjects exit the vehicle and walk into the field. The two subjects were walking around in the field for about 30 seconds, and then the officer observed one of the subjects running back to the car with an object in his hands. The subjects got back into the vehicle and started to pull away. After proceeding about 25 to 30 feet, Officer Hester, who was in plain clothes and driving his own unmarked vehicle, pulled in front of the Lincoln and effected a stop.
Officer Hester exited his vehicle with his badge in one hand and his gun in the other. As the occupants got out of the car, Officer Hester ordered them to put their hands on the car. The officer testified that the Lincoln had come to a stop almost directly under a streetlight and that when he looked into the car, he saw a video cassette recorder lying on the floorboard behind the driver's seat. The officer stated that he had no conversation with the subjects at the scene and that he did not place them under arrest but merely detained them for questioning at the Oswego police department.
In the meantime, Officer Plock had obtained the items he had returned to the police department to get and was just entering his squad car when he received a dispatch that Officer Hester needed assistance at Boulder Hill Pass. Officer Plock and another officer, Bill Law, proceeded to that location. Officer Plock testified that he took respondent into custody and that at that time respondent was not under arrest although, due to the officer's own observations, his conversation with Rippo, his conversation with Officer Hester at the scene, and his own observation of the VCR in the Lincoln Continental, he suspected respondent was probably involved in a burglary. The officer transported the respondent to the police department.
At about 10 p.m., Officer Plock was dispatched to 22 Sedgewick, a residence two houses west of Mr. Rippo's residence, in response to a report of a residential burglary. Upon arriving at 22 Sedgewick, the owner of the residence, Sharon Dee, reported to the officer that a VCR and a car AM/FM cassette radio tuner were missing. The serial number, model number, and brand of Ms. Dee's VCR matched those of the VCR found in the black Lincoln.
At the police department, Officer Hester conducted an interview with respondent after reading him his Miranda rights; respondent's mother was present. During that interview, respondent admitted his involvement in the reported burglary and implicated the corespondent. *883 After the interview, respondent prepared a written statement regarding his involvement.
Respondent testified that although Officer Hester read him his Miranda rights, the officer had refused to obtain an attorney for respondent, although the minor had requested one. On cross-examination, respondent admitted that being taken into custody by the police was not a new experience for him and that he knew he did not have to talk to Officer Hester without an attorney present, yet he had gone ahead and talked to the officer.
The trial court denied the motion to quash arrest, stating that at the time of the arrest the police had reasonable grounds to believe that a crime had been committed by the juveniles in the Lincoln Continental. The court also denied the motion to suppress statements, finding that Officer Hester's testimony was more credible than respondent's and that respondent, therefore, voluntarily made his statement after having been warned of his Miranda rights.
As to the petition for adjudication of wardship, the court found that respondent and the corespondent had committed residential burglary and theft and adjudicated them delinquent minors. Subsequently, a joint dispositional hearing on the separate causes of respondent and corespondent was held on July 18, July 30, and August 8, 1986. At the conclusion of the dispositional hearing the court made respondent and the corespondent wards of the court. The court commented that respondent's conduct indicated that he did not recognize the need for rehabilitation. Moreover, his behavior at the youth home during his period of detention illustrated his lack of conformity to alternative situations other than a restrictive environment. Additionally, the social history of respondent indicated he needed a restrictive environment. The court found that the evidence showed that the parents of respondent were unable for reasons other than financial to care for, protect, train, or discipline the minor respondent, and the best interests of both respondent and the public would be served by committing him to the custody and supervision of the Department of Corrections, Juvenile Division.
Respondent filed a timely notice of appeal.
 1-3 Respondent first contends that the trial court erred in denying his motion to quash arrest and suppress evidence as the police lacked probable cause to arrest respondent. It is respondent's position that at the time of his arrest the arresting officers did not know that a crime had been committed.
The test for probable cause is whether the facts and circumstances within the arresting officer's knowledge are sufficient to warrant *884 a man of reasonable caution in believing that an offense has been committed and that the individual arrested committed the offense. (People v. Reynolds (1983), 94 Ill.2d 160, 165-66, 445 N.E.2d 766, 769; People v. Lippert (1982), 89 Ill.2d 171, 178, 432 N.E.2d 605, 608; People v. Agnew (1987), 152 Ill. App.3d 1037, 1040, 504 N.E.2d 1358, 1360.) The probable cause test is equally applicable to cases where a juvenile is taken into custody. (In re Foster (1978), 66 Ill. App.3d 193, 197, 383 N.E.2d 755, 757-58.) Mere suspicion that the person arrested has committed an offense is an insufficient basis for arrest, but evidence sufficient to convict is not required. (Lippert, 89 Ill.2d at 178, 432 N.E.2d at 608.) Probable cause for an arrest may be established on the basis of all information possessed by policemen working in concert. (People v. Fox (1987), 155 Ill. App.3d 256, 263, 508 N.E.2d 475, 480.) The probable cause test is a compromise for accommodating the "often opposing interests" of privacy and law enforcement, and there is good reason for striking the compromise on the side of privacy where it is uncertain whether any crime has occurred. (Reynolds, 94 Ill.2d at 166, 445 N.E.2d at 769; Lippert, 89 Ill.2d at 179-80, 432 N.E.2d at 608-09.) Under the facts and circumstances of the case at bar, no uncertainty existed.
The facts established that on the evening of June 28, 1986, at about 6 p.m., Fred Rippo observed two youths running through the open field behind Rippo's house. At approximately 6:15 p.m., he saw the same two youths returning back through the field to Boulder Hill Pass carrying a "large electronical object." The youth carrying the object laid it down and then picked it up and ran with it for another 20 to 30 feet before setting it down again when the other youth instructed him to, "Drop it, we'll come back later to pick it up." Both youths left.
At about this same time Officer Plock was on patrol on Boulder Hill Pass. He noticed respondent and the corespondent, or his twin brother, proceeding through the same open field towards Boulder Hill Pass. Officer Plock testified that he knew respondent by sight.
Rippo kept the field in his view as he cooked outside and ate dinner. After dinner Rippo walked into the field to the spot where he saw the youths drop the object. After discovering that the object was a VCR, Rippo returned to his house and phoned the police. At about 7:30 p.m., Officer Plock was dispatched to Rippo's house in response to Rippo's call. Rippo related his observations and subsequent discovery to the officer. Officer Plock testified that he did not go out into the field to observe the VCR himself, as he was in full uniform and felt that if somebody was returning for the VCR, he would be spotted. *885 Instead the officer remained in Rippo's backyard to watch the area. The officer also contacted Officer Hester to come and take over the surveillance.
When Officer Hester arrived at Rippo's house, Officer Plock related to him what Rippo had told Plock regarding the incident in the field. Officers Hester and Plock decided that Hester should take up a position on Boulder Hill Pass near the field for surveillance purposes. Subsequently, while on surveillance, Officer Hester observed a black Lincoln Continental pull up near the field and two individuals exit the car. Both individuals walked to the field and walked around in it for a short time. Then the officer saw one of the individuals running back towards the Lincoln with an object in his hands. The individuals entered the car. As it began to pull away, the officer effected a stop and ordered the individuals out of the Lincoln. The car had come to rest near a streetlight, and through the car window the officer was able to see a VCR on the floorboard behind the driver's seat.
Immediately thereafter, Officers Plock and Law responded to a dispatch stating that Officer Hester needed assistance with some juveniles. Before arriving at the scene of Hester's stop, Officer Plock informed Officer Law of the earlier events in the field next to Boulder Hill Pass and of Rippo's report. Subsequent to the officers' arrival at the scene of the stop, the juveniles were taken into custody.
 4 On the basis of these facts, we believe the arresting officers had probable cause to believe that a crime had been committed and that the juveniles arrested had committed it. Respondent contends that the fact that a VCR was seen dropped in a field and later retrieved does not give rise to reasonable certainty that a crime has been committed. We, however, are compelled to disagree with such an assertion, as it is extremely unlikely, as the State points out, that any owner of a VCR would drop and leave it unattended in an open field.
Respondent has relied heavily on the case of People v. Reynolds (1983), 94 Ill.2d 160, 445 N.E.2d 766, to make his argument that no probable cause existed for his arrest. However, the ruling in Reynolds was based exclusively on the circumstances surrounding that arrest, and those circumstances established that the arresting officer possessed no more than a mere suspicion that the defendants in that case were committing or had committed an offense. The instant case is dissimilar to Reynolds because, as illustrated by the facts related above, the arresting officers were not acting on a mere hunch but on a reasonable belief that the individuals to be arrested had committed a crime. In fact, we agree with the State that the circumstances of this case would lead any reasonable person to believe that a crime was *886 committed and that respondent had participated in its commission.
 5 As respondent's arrest was supported by probable cause, his statements and the physical evidence obtained pursuant to the arrest did not constitute fruits of an illegality. Moreover, from our review of the evidence presented regarding respondent's incriminating statement to the police, we concur with the trial court's finding that the testimony of the interrogating officer was more credible than respondent's and that respondent's statement was voluntarily given after he received the Miranda warnings.
Thus, we will not disturb the trial court's findings on respondent's motions to quash arrest and suppress evidence and to suppress statements, as we find neither to be manifestly erroneous. Reynolds, 94 Ill.2d at 165, 445 N.E.2d at 768-69; People v. Simpson (1984), 129 Ill. App.3d 822, 830, 473 N.E.2d 350, 356.
 6, 7 In his second contention, respondent argues that the trial court abused its discretion in committing him to the Department of Corrections. Specifically, respondent maintains that the record in the instant matter fails to support the court's finding that the respondent's parents were unable to care for, protect, train, and discipline him. Additionally, respondent contends that the court failed to consider less restrictive alternatives available to the minor.
The Juvenile Court Act (the Act) provides that a minor may be committed to the Department of Corrections if the court finds that (1) his parents are unfit or unable for some reason other than financial circumstances alone, to care for, protect, train, or discipline the minor, or are unwilling to do so, and (2) the best interests of the minor and the public will not be served by placement under section 5-7 of the Act. Ill. Rev. Stat. 1985, ch. 37, par. 705-10(1).
The disposition of a minor rests within the discretion of the trial judge, whose decision will not be disturbed unless it is contrary to the manifest weight of the evidence. (In re T.M. (1984), 125 Ill. App.3d 859, 861, 466 N.E.2d 1328, 1330.) Although commitment is to be utilized only when less severe placement alternatives would not be in the best interests of the minor and the public, a juvenile court may consider a variety of factors such as prior arrests, station adjustments or curfew violations, and the social investigation in determining whether to commit the minor to the Department of Corrections. (In re M.D.B. (1984), 121 Ill. App.3d 77, 83, 458 N.E.2d 1380, 1385.) Further, the Act gives the juvenile court wide discretion in determining an appropriate disposition. In re T.A.C. (1985), 138 Ill. App.3d 794, 798, 486 N.E.2d 375, 378.
In the instant case, respondent had a history of delinquency, having *887 committed three separate criminal offenses, the last of which was committed while respondent was on supervision for the prior offense. The latter offense involved a residential burglary committed in broad daylight for which respondent could have been incarcerated if tried as an adult. Additionally, respondent had been reported as a runaway on a number of occasions and had a history of suspensions and expulsions from school.
Although respondent's parents appeared to love and wanted to help him, they had both been unsuccessful in the past in controlling his behavior. Respondent had lived with both parents at different times. Frequent domestic disturbances, requiring police intervention, occurred whenever respondent lived with his mother. Also, both the social history and the psychological reports from Mercy Center indicated alcohol abuse problems existed in the mother's home. Although the respondent's mother used grounding and curfews to discipline respondent, she admitted to the juvenile probation officer that respondent did not learn anything from these procedures. While respondent was living with his father and his stepmother, they had moved in an effort to prevent respondent from having contact with corespondent and his twin brother, whom respondent considered his best friends and whom respondent's father considered a bad influence. However, the minor responded to his new residence by refusing to seek new friendships in the area and to constantly request to be returned to his mother's home.
At the dispositional hearing, respondent's counsel argued for probation with regular counseling. However, the record shows that counseling with the respondent and his family had occurred in the past and that counseling had not deterred respondent from committing the instant offense. Counsel also argued that respondent had the strength of both parents to help him conform on probation. Yet, as discussed above, both parents had tried to control respondent in the past and had been unsuccessful. Further, we note the psychological reports from Mercy Center indicate that respondent had been on probation in the past. Obviously, that disposition had been ineffectual in deterring him from further confrontations with the law.
In reaching its disposition, the court had before it all the evidence presented at the adjudicatory and dispositional hearings, the respondent's social investigation report, which included the juvenile probation officer's recommendation that respondent be committed to the Department of Corrections, the psychological reports from Mercy Center, school reports, and the detention resident reports, which coincided with the social investigation report and the psychological *888 reports and illustrated that respondent had such a disdain for authority and conventional social behavior that he was unlikely to independently learn by experience to modify his behavior. All this evidence showed that respondent needed the structured and rehabilitative setting that could best be supplied by the Department of Corrections.
Respondent's claim that the trial court did not consider less restrictive alternatives is not supported by the record. Subsequent to the adjudicatory hearing, the court admonished respondent of possible alternative dispositions, including possible probation under the supervision of the Department of Alcoholism and Substance Abuse if it was determined that respondent needed treatment and if the court made such a finding to that effect. The court explained to respondent that if it determined no significant relationship existed between the respondent's possible drug addiction and the crime committed or that imprisonment was necessary, the court would then proceed under the criminal statutes instead of under the alternative treatment plan of the Alcoholism and Substance Abuse Act. The court asked respondent if he understood these alternatives, and the respondent replied affirmatively.
At the dispositional hearing the court discussed a report from Treatment Alternatives to Street Crime (TASC), which indicated respondent was a candidate for alternative sentencing under the Alcoholism and Substance Abuse Act. However, the court pointed out that a letter from TASC showed that the Department of Alcoholism and Substance Abuse was unable to provide any further services for juveniles at the time of respondent's disposition. The court mentioned that some alternative inpatient programs might accept respondent for treatment but that no funding was available for these programs and that the programs would be very similar to what the respondent would receive at the Department of Corrections.
 8, 9 A judge need not enumerate all possible alternatives when making a disposition (In re S.R.F. (1980), 80 Ill. App.3d 738, 741, 399 N.E.2d 1382, 1384), and the remarks of the trial judge can illustrate a consideration of alternatives. (In re Thomas (1978), 56 Ill. App.3d 587, 594, 372 N.E.2d 134, 139.) We believe the trial judge's remarks subsequent to the adjudicatory and dispositional hearings illustrate that he did consider placement alternatives. Under the circumstances here, we find that respondent's commitment to the Department of Corrections is supported by the evidence and that no abuse of discretion occurred.
 10 Finally, we note that a minor or any person interested in the minor may at any time apply to the court for a change in custodianship *889 or for the restoration of the minor to the custody of his parents. (Ill. Rev. Stat. 1985, ch. 37, par. 705-8(3); In re Bardwell (1985), 138 Ill. App.3d 418, 420, 485 N.E.2d 1239, 1240-41.) Also, the court must terminate its wardship of a minor and all proceedings under the Act if at any time it finds the best interests of the minor and the public no longer require it to be continued. (Ill. Rev. Stat. 1985, ch. 37, par. 705-11(2); Bardwell, 138 Ill. App.3d at 420, 485 N.E.2d at 1240-41.) Commitment to the Department of Corrections is not a bar to pursuing relief under either of these sections of the Act. (138 Ill. App.3d at 420, 485 N.E.2d at 1240-41.) Thus, this continuous opportunity to seek early release from the Department of Corrections is available to the respondent.
 11 Respondent next contends it was error to combine the dispositional hearing of respondent with that of the corespondent. The State maintains, however, that respondent's failure to object to a joint dispositional hearing in the trial court results in a waiver of that issue on review since appeals from juvenile proceedings are subject to the waiver rule. (In re R.L.G. (1984), 125 Ill. App.3d 292, 294, 465 N.E.2d 1025, 1026-27; In re T.D. (1980), 81 Ill. App.3d 369, 371, 401 N.E.2d 275, 276.) Respondent readily admits that he did not object to the joint nature of the dispositional proceedings, but maintains a joint dispositional hearing substantially impaired his right to a fair hearing and that, therefore, this court should consider this contention of error under the plain error rule (107 Ill.2d R. 615(a)). We consider respondent's claim of error to determine whether it falls within the rule.
The purpose of the Juvenile Court Act is to secure for each minor such care and guidance as will serve the moral, emotional, mental, and physical welfare of the minor and the best interests of the community. (Ill. Rev. Stat. 1985, ch. 37, par. 701-2(1).) A dispositional hearing is conducted to determine whether it is in the best interests of the minor and the public that he be made a ward of the court, and if he becomes a ward of the court, to determine the proper disposition best serving the interests of the minor and the public. (Ill. Rev. Stat. 1985, ch. 37, par. 705-1(1).) Respondent maintains that the trial court failed to consider his best interests when it consolidated the dispositional phase of the juvenile proceedings involving the two respondent minors.
Initially, we note that neither case law nor statute prohibits a juvenile court from holding a joint dispositional hearing. Additionally, a review of the joint dispositional proceeding reveals that respondent was not prejudiced by the consolidation.
 12 Respondent argues that the trial court's contemporaneous *890 consideration of the evidence relating to both respondents seriously impaired the court's ability to evaluate each respondent on an individual basis. We note, however, that the trial court dealt with each respondent alternately, discussing first whether each was a suitable candidate for alcohol and substance abuse treatment. The court then reviewed the past record of each respondent and discussed the conduct of each since being charged with the immediate offense. The court referred to the number of charges against the corespondent, concluding that imprisonment was necessary for the protection of the public. While specifically pointing out that respondent's past record was not as bad as the corespondent's, the court noted that respondent's behavior, since being charged with the instant offense, reflected his lack of conformity and the necessity of his being kept in a restrictive environment for the protection of the public. Additionally, the court mentioned that a social history had been prepared on each minor, as is required by the Act before a minor's commission to the Department of Corrections (Ill. Rev. Stat. 1985, ch. 37, par. 705-1(1); In re R.D. (1980), 84 Ill. App.3d 203, 205, 405 N.E.2d 460, 461-62), and these histories indicated that each minor needed a restrictive and controlled environment.
In our view, the record does not demonstrate any confusion on the part of the court in distinguishing between the two minors' backgrounds. Even the court's statement regarding respondent's being on probation at the time he committed the instant offenses, while erroneous, did not reflect confusion between the two minors' backgrounds. Given the evidence before the trial judge and the remainder of his remarks in determining the disposition of each minor, we find the erroneous remark regarding respondent's prior probation to be harmless and conclude that, absent this comment by the trial judge, respondent's disposition would not have been otherwise.
Respondent also contends that the joint dispositional hearing deprived him of his right to confidentiality since the corespondent as well as the corespondent's mother, father, and sisters were present on different occasions during the dispositional proceeding. Respondent claims that section 1-20 of the Act (Ill. Rev. Stat. 1985, ch. 37, par. 701-20(6)), which provides that the general public shall be excluded from any juvenile hearing, is thwarted when any person not having a direct interest in the proceedings is allowed to attend. However, in the instant joint dispositional proceeding, it is obvious that the parents and sisters of the corespondent had a direct interest in the proceeding. As respondent has provided no authority to show that a joint dispositional hearing is prohibited, we cannot conclude that the confidentiality *891 of such a hearing is thwarted when the family members of both respondents are present during that proceeding. Further, since neither respondent nor his counsel objected to the presence of these other persons at the dispositional hearing, we consider the issue of confidentiality to be waived. See In re R.L.G., 125 Ill. App.3d at 294, 465 N.E.2d at 1026-27.
Last, respondent contends he was denied effective assistance of counsel due to the counsel's dual representation of respondent and the corespondent at their joint dispositional hearing. It is respondent's position that this representation created a conflict of interest which substantially impaired the effectiveness of counsel's representation.
It is noteworthy that the record reflects that, at the inception of these juvenile proceedings, the court specifically asked each respondent and his respective parents if any one of them objected to joint representation by defense counsel. Each replied in the negative. We do not believe that the trial judge was required to repeat this inquiry at every stage of the proceedings. We consider, therefore, respondent's failure to object to dual representation at the time of the court's original inquiry to constitute a waiver of that issue on review. Nevertheless, as the defect of which respondent complains affects a substantial right, i.e., the fundamental right to effective assistance of counsel, we consider it under the plain error rule. 107 Ill.2d R. 615(a).
 13, 14 Although juvenile proceedings have been characterized as civil in nature, certain due process safeguards normally associated with criminal proceedings have been extended for the protection of juveniles. (In re S.R.H. (1983), 96 Ill.2d 138, 144, 449 N.E.2d 129, 131.) Among these safeguards is the right to counsel as provided in the fourteenth amendment to the United States Constitution. (In re Gault (1967), 387 U.S. 1, 18 L.Ed.2d 527, 87 S.Ct. 1428.) The right to counsel is specifically included in the Juvenile Court Act (Ill. Rev. Stat. 1985, ch. 37, par. 701-20(1)), and implicit within that right is that counsel's representation be effective. (In re Johnson (1981), 102 Ill. App.3d 1005, 1011, 429 N.E.2d 1364, 1370.) Here, counsel's representation fell well within the "range of reasonable professional assistance." Strickland v. Washington (1984), 466 U.S. 668, 689, 80 L.Ed.2d 674, 694-95, 104 S.Ct. 2052, 2065-66.
We are not persuaded by respondent's first argument that counsel was hindered in his ability to emphasize respondent's less serious delinquent history by his loyalties to corespondent. Contrary to respondent's contention here, counsel in his argument at the dispositional *892 hearing did distinguish the records of both minors. Further, the fact that counsel requested the same disposition, probation, for both youths does not establish that his representation of respondent was incompetent.
 15, 16 Respondent also argues that counsel's failure to object to his dual representation of the minors amounted to ineffective assistance of counsel. At the inception of the juvenile proceedings, the court, in appointing counsel to represent both minors, pointed out that no apparent conflict existed between the minors in what their evidence would be. The court asked counsel if he perceived any conflict in dual representation. Counsel replied, "I have no idea that there is a conflict at this point, your Honor." It appears from this remark that had counsel encountered a conflict at some subsequent point in the proceedings, he would have advised the minors as well as the court of that conflict.
Joint representation is not per se violative of constitutional guarantees of effective assistance of counsel. (See Holloway v. Arkansas (1978), 435 U.S. 475, 55 L.Ed.2d 426, 98 S.Ct. 1173; Glasser v. United States (1942), 315 U.S. 60, 86 L.Ed. 680, 62 S.Ct. 457; People v. Nelson (1980), 82 Ill.2d 67, 411 N.E.2d 261.) The question to be addressed in joint representation cases is whether an actual conflict of interest exists. (82 Ill.2d at 72, 411 N.E.2d at 264.) Since the record here reflects no antagonistic defense theories or other specific circumstances requiring separate counsel for the minors and since mere hypothetical or speculative conflicts of interest will not suffice (People v. Robinson (1979), 79 Ill.2d 147, 169-70, 402 N.E.2d 157, 168), we conclude that no conflict has been shown and that, therefore, respondent was not prejudiced by the failure of his counsel to object to dual representation of the minors.
Further, we find respondent's argument that the trial court erred in not inquiring into the conflict of interest to be vexatious, since, as noted above, no conflict of interest existed. Nevertheless, in his argument respondent posits that once the judge examined the social investigation report prepared on each minor, he should have known of a conflict of interest. We fail to grasp the significance of this position, but note anyway that the report prepared on respondent supports the trial judge's disposition. That report and the psychological reports submitted with it discussed, among other things, respondent's past involvement with the police, his inability to internalize conventional social behavior, his parents' unsuccessful attempts, including counseling, to control respondent's behavior, and his juvenile probation officer's recommendation that he be committed to the Department of Corrections.
*893  17 Despite respondent's complained-of disparity between the delinquent backgrounds of the minors, it is apparent from the social and personal history of respondent that it was in his best interest to be committed to the Department of Corrections. Thus, even if it could be said that counsel's dual representation of respondent and corespondent at their joint dispositional hearing created a conflict of interest which impaired the effectiveness of counsel's representation, it is unlikely that the outcome of the dispositional hearing would have been different.
For the reasons set forth above, we find sufficient record basis to uphold the trial court's disposition of the respondent to the Department of Corrections, and, therefore, we affirm the judgment of the circuit court of Kendall County.
Affirmed.
DUNN and WOODWARD, JJ., concur.