# Illinois Official Reports

## Appellate Court

---

### *In re N.L.* 2014 IL App (3d) 140172

---

| | |
|---|---|
| Appellate Court Caption | *In re* N.L. and M.L., Minors (The People of the State Illinois, Petitioner-Appellee, v. Dwight L., Respondent-Appellant). |
| District & No. | Third District<br>Docket Nos. 3-14-0172, 3-14-0173 cons. |
| Filed | September 9, 2014 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | In an action arising from the relationship of respondent and his wife and two children, the supplementation of the record on respondent's appeal was allowed in the interest of justice, the cause was remanded to allow the State to proceed anew with regard to the youngest child, for whom the State failed to provide adequate notice pursuant to the Indian Child Welfare Act to the tribe the child was allegedly eligible to join, and to file a petition to terminate respondent's parental rights to the older child or obtain his surrender of parental rights to that child based on DNA tests showing that he was not the child's father; furthermore, the appellate court found that there was no *per se* conflict of interest in allowing one attorney to initially represent both respondent and his wife, especially when they were not adversaries and had a joint interest in reestablishing their family. |
| Decision Under Review | Appeal from the Circuit Court of McDonough County, Nos. 11-JA-3, 12-JA-1; the Hon. Patricia A. Walton, Judge, presiding. |
| Judgment | Reversed and remanded. |

Counsel on
Appeal

Susan K. O'Neal, of Oak Park, for appellant.

James L. Hoyle, State's Attorney, of Macomb (Mark A. Austill, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.


Panel

JUSTICE McDADE delivered the judgment of the court, with opinion.
Justice O'Brien concurred in the judgment and opinion.
Justice Wright specially concurred, with opinion.

**OPINION**

¶ 1  The trial court found Dwight L., respondent-father, to be an unfit parent and terminated his parental rights with respect to the minor M.L. The trial court also found Dwight to be an unfit parent with respect to N.L., but terminated his legal relationship with N.L. based on a previous showing that he is not the biological father of N.L. The issues on appeal are (1) whether the trial court erred in allowing the State to supplement the record on appeal; (2) whether the trial court failed to adhere to the requirements of the Indian Child Welfare Act (ICWA) (25 U.S.C. §§ 1911 to 1914 (2006)) with respect to M.L. and N.L.; (3) whether the trial court exceeded its authority in finding that Dwight no longer retained a legal relationship with N.L.; and (4) whether Dwight was deprived of effective counsel due to a *per se* conflict of interest. For reasons that follow, we reverse and remand for proceedings in accord with this opinion.

¶ 2                    Summary of Relevant Facts

¶ 3  Dwight and the respondent-mother, Emily L., were remarried on July 11, 2010. Their son N.L. was born on January 31, 2011, and four days later, on February 3, 2011, the State filed a petition of neglect against both parents alleging that the minor was neglected by reason of an injurious environment and a petition for temporary custody. Both petitions alleged that Emily had already been found to be an unfit parent as to earlier-born siblings and had failed to regain parental fitness. It was also alleged that both parents had a history of domestic violence and that Dwight had a history of criminal activity involving alcohol and illegal drugs.

¶ 4  A shelter care hearing was held on February 3, 2011. Both parents were present. Dwight responded to the court's inquiry that he had no objection to Emily's attorney, Ramon Escapa, representing both of them in the proceeding. Escapa had previously represented Emily in unrelated proceedings and had already been appointed to represent her in the instant case. Both parties stipulated to the minor being placed in the temporary custody of the Department of Children and Family Services (DCFS). On March 24, 2011, the parties appeared for a pretrial conference and admitted the allegations of the February 3 neglect petition. An adjudicatory

order was entered by agreement on March 24, 2011, finding that the minor was neglected by reason of an injurious environment.

¶ 5    At the dispositional hearing on April 26, 2011, the trial court found Dwight to be unfit and awarded guardianship of N.L. to DCFS. Among the reports submitted for the court's consideration was a social history report, dated March 23, 2011, indicating that Dwight is a registered member of the Minnesota Chippewa Tribe, White Earth Reservation (the Tribe).

¶ 6    At the status hearing on July 21, 2011, an agent of Lutheran Social Services of Illinois (LSSI), the agency acting for DCFS, submitted a report stating that Dwight had consistently visited the minor and had faithfully participated in his court-ordered services. The court found that Dwight and Emily could have overnight visitation with N.L. at the agency's discretion.

¶ 7    However, at the October 25, 2011, permanency review hearing the court found that Dwight had failed to make satisfactory progress toward the goal for return home of the minor, citing reports of new domestic violence incidents between the parents, including one on October 4, which resulted in Dwight's arrest. The court set the permanency goal for return home in 12 months.

¶ 8    M.L. was born to Dwight and Emily on December 29, 2011. A petition for temporary custody was filed the same day and a petition for adjudication of wardship was filed on January 3. At a shelter care hearing for M.L. held on January 4, Dwight and Emily stipulated that neither of them had yet been restored to fitness. On February 16, the court, by dispositional order as to M.L., found that both parents remained unfit and awarded guardianship to DCFS.

¶ 9    On March 8, 2012, Dwight was convicted and sentenced to one year in prison for the domestic abuse arrest of October 4, 2011. Prior to his incarceration and notwithstanding the domestic violence incidents, Dwight had been showing improvement by participating in marital counseling and sex offender group therapy. He reported during counseling that not having his family together caused him the most stress.

¶ 10   At a permanency review hearing on April 12, 2012, relative to both minors, Emily was restored to fitness. However, because of Dwight's incarceration, the court prohibited all visits between him and the minors, except for times he was back in McDonough County for court appearances.

¶ 11   On August 10, while Dwight was still in prison, Emily called LSSI and stated that N.L. was not Dwight's child, that he was conceived as the result of rape, and that she wanted to surrender N.L. for adoption. She requested DNA testing and the results, reported on September 19, established that Dwight was not the biological father of N.L. Dwight and Emily began to consider a separation. At some point, Emily contacted LSSI regarding a divorce, advised it that a male friend, James, was cohabitating with her, and inquired about the effect the cohabitation would have on her visitation with the minors in her home.

¶ 12   On October 18, 2012, Escapa, asserting a conflict of interest in representing both parents, was permitted to withdraw as Dwight's attorney and the public defender was appointed as Dwight's counsel. The trial court questioned the State about the children's eligibility for tribal registry and was advised that the State had already received notices that both minors were ineligible for registry with the Tribe. The State was ordered to provide documentation of its compliance with the statute at the status hearing on December 18. No documents addressing the issue of tribal registry for the minors were submitted at that or any subsequent proceeding

until the hearing on the State's motion to supplement the record during the pendency of this appeal.

¶ 13 Dwight's domestic violence conviction was dismissed and he was released from prison on October 30. His arrival at the marital home and discovery that Emily was cohabitating with another man resulted in police involvement. While incarcerated for that incident, Dwight advised LSSI of Emily's various amoral actions.

¶ 14 The permanency goal was changed again on February 14, 2013, to substitute care pending a court determination of parental rights. On March 4, the State filed a petition to terminate Dwight's parental rights as to M.L. A similar petition was filed as to N.L., but Dwight was not named as father in that petition despite the statutory presumption that he is the child's legal father. The petition listed the father as unknown and alleged him to be an unfit parent for failure to have any contact with N.L.

¶ 15 On May 9, following its receipt of new DNA results, the trial court found James Smith to be the biological father of N.L. The State filed an amended termination petition on June 4, naming James Smith the father of N.L. and alleging his unfitness for a variety of reasons.

¶ 16 After lengthy hearings the trial court found Emily, Smith, and Dwight all to be unfit parents. A best interest hearing was held on November 25. As a result of that hearing, the trial court found it to be in M.L.'s best interest that Emily's and Dwight's parental rights be terminated, and that it was in N.L.'s best interest that Emily's and Smith's parental rights be terminated. In a separate order, Dwight's legal relationship to N.L. was severed because he was not N.L.'s biological father.

¶ 17 On December 20, Dwight's attorney filed a motion to reconsider. That motion was denied and the written order to that effect was entered on February 6, 2014. A timely notice of appeal was then filed.

¶ 18 In compliance with this court's briefing schedule. Dwight filed his opening brief by April 10. Shortly thereafter, on April 29, the State filed a motion in the trial court seeking to supplement the appellate record. That motion was granted on May 8, despite Dwight's motion to dismiss it. The State's supplementation included several documents from various Indian registries, including the Tribe, showing that N.L. and M.L. were not eligible for membership. The State's Tribe letters suggest that the Tribe was provided with the minors' names and dates of birth and imply that Dwight's name was provided with reference to N.L. The State's Tribe letter for N.L is dated September 16, 2011, and that for M.L. is dated February 25, 2013. In its order granting the State's motion to supplement the record, the court expressed concern with Dwight's solicitation of new evidence while the case was on appeal. However, many of the documents the State was allowed to include with its supplementation were dated after the termination hearing and after Dwight's notice of appeal.

¶ 19 Dwight filed a motion with this court to supplement the record with his own Tribe letter–from the same person who had signed the State's letters–showing that N.L. and M.L. were eligible for tribal membership. He acquired this letter as a result of his solicitation for evidence related to the appeal. This court allowed Dwight to submit his Tribe letter with his case pending our decision of the propriety of its inclusion in the record. Dwight's Tribe letter states that the minors are eligible for tribal membership and suggests that the Tribe was provided with the dates of birth for both minors, the correct spelling of N.L.'s name, and the names and dates of birth for both Dwight and Emily.

¶ 20 ANALYSIS

¶ 21 Motion to Supplement the Record on Appeal

¶ 22 Dwight's first argument is that the trial court erred in allowing the State to supplement the record on appeal with letters from various tribal registries to establish its compliance with the requirements of the ICWA. 25 U.S.C. § 1901 *et seq.* (2006). He asserts that supplementation was not supported by any statutory authority. Although the trial court lacked jurisdiction to rule on the motion to supplement the record on appeal with this substantive information after the notice of appeal was filed, the supplementation is supported by the supreme court rule and is confirmed here in the interest of justice.

¶ 23 The filing of a notice of appeal transfers jurisdiction from the trial court to the appellate court *instanter*. *R.W. Dunteman Co. v. C/G Enterprises, Inc.*, 181 Ill. 2d 153, 162 (1998). However, the trial court retains jurisdiction on matters collateral or supplemental to the judgment. *In re Marriage of Sawyer*, 264 Ill. App. 3d 839 (1994). " 'Collateral or supplemental matters include those lying outside the issues in the appeal or arising subsequent to delivery of the judgment appealed from.' " *Physicians Insurance Exchange v. Jennings*, 316 Ill. App. 3d 443, 453 (2000) (quoting *Town of Libertyville v. Bank of Waukegan*, 152 Ill. App. 3d 1066, 1073 (1987)). Pointedly, orders entered after the filing of the notice of appeal are valid if the substantive issues on appeal are not altered so as to present a new case to the reviewing court. *R.W. Dunteman Co.*, 181 Ill. 2d at 162.

¶ 24 Here the trial court granted the State's motion to supplement the record on appeal with documents supporting its assertion that it provided notice to various tribes of the foster care and termination of parental rights proceedings for N.L. and M.L. The motion was filed and granted after the notice of appeal was filed. This motion came on the heels of Dwight's filing of his appellate brief with its first issue of whether the State failed to provide notice to the Tribe. Thus this is clearly not collateral or supplemental, but a substantive issue on appeal. Dwight also moved to supplement the record with other information directly related to the State's supplementation. We ordered additional briefing so the parties could address these issues. It is clear that the information the trial court allowed to supplement the record did alter this substantive issue on appeal. Thus the trial court did not have jurisdiction.

¶ 25 However, we allow the State's supplementation with documents in existence prior to the filing of the notice of appeal because we find it to be in the interest of justice. Illinois Supreme Court Rule 329 (eff. Jan. 1, 2006) " 'provides that a party may supplement the record on appeal to include omissions, correct errors, and settle controversies as to whether the record accurately reflects what occurred in the trial court.' " *Farmers Automobile Insurance Ass'n v. Danner*, 394 Ill. App. 3d 403, 408 (2009) (quoting *Jones v. Ford Motor Co*., 347 Ill. App. 3d 176, 180 (2004)). However, the record on appeal can be " 'supplemented only with evidence actually before the trial court.' " *Id*. (quoting *Jones*, 347 Ill. App. 3d at 180); see also *Avery v. Sabbia*, 301 Ill. App. 3d 839, 843-44 (1998) (matters not properly part of the record and not considered by the trial court will not be considered on review even though included in the record).

¶ 26 The State's supplementation corrects the trial court's error of not ensuring their inclusion after directing the State to produce them. We find that the documents do supplement the State's assertion of their existence.

¶ 27 Dwight has also moved to supplement the record on appeal with a letter dated April 15, 2014, purporting to show that the Tribe, armed with correct information about family members, had determined that the minors were eligible for tribal registration. This letter was not in existence during the pendency of this case in the circuit court and the law is clear that we cannot consider it on appeal. We therefore deny Dwight's motion and the letter will not be considered in our determination of whether the State complied with the ICWA.

¶ 28 In summary, we emphasize that our analysis will include only those documents produced by the State that were in existence prior to the appeal.

¶ 29                                    ICWA Compliance

¶ 30 Next, Dwight argues that the State failed to comply with the ICWA by not providing adequate notice to the Tribe of the foster care and the parental termination proceedings for N.L and M.L. He asserts that because the record as supplemented only has the responses from the Tribe and not the State's notice to them, the notice is deemed insufficient. We agree.

¶ 31 Whether the trial court was required by the ICWA to give notice to the Tribe and the sufficiency of any such notice are issues of statutory interpretation, which we review *de novo*. *In re K.T.*, 2013 IL App (3d) 120969, ¶ 9.

¶ 32 The ICWA provides:

> "In any involuntary proceeding in a [s]tate court, where the court knows or has reason to know that an Indian child is involved, the party seeking the foster care placement of, or termination of parental rights to, an Indian child shall notify the parent or Indian custodian and the Indian child's tribe *** of the pending proceedings and of their right of intervention." 25 U.S.C. § 1912(a) (2006).

¶ 33 The ICWA allows any parent or Indian custodian from whose custody an Indian child was removed to petition the court to invalidate the foster care placement or termination of parental rights if the court violated any provisions included in section 1911, 1912, or 1913 of the ICWA. 25 U.S.C. § 1914 (2006). "Thus, if a court fails to provide notice as required by section 1912 of the [ICWA], the proper remedy is to reverse the trial court's orders concerning foster care placement or termination of parental rights and begin the proceedings anew in compliance with the requirements of the [ICWA]." *In re K.T.*, 2013 IL App (3d) 120969, ¶ 15. Additionally, contrary to the State's assertion that such a right should have been brought and proven by Dwight during the trial, the statutory rights of the Tribe cannot be waived or forfeited by a parent and it is the court's responsibility to make such a finding if presented with sufficient evidence that the minors are likely "Indian children." See *Mississippi Band of Choctaw Indians v. Holyfield*, 490 U.S. 30, 49 (1989) (noting that tribal jurisdiction was not meant to be defeated by the actions of individuals, even the parents of the Indian children); see *In re J.O.*, 170 P.3d 840, 842 (Colo. App. 2007) (providing that the notice requirements cannot be forfeited, and the issue may be raised for the first time on appeal).

¶ 34 Compliance with the ICWA requires the trial court to, at minimum, include in the record "(1) the original or a copy of the actual notice sent by registered mail pursuant to section 1912, and (2) the original or a legible copy of the return receipt or other proof of service." *In re K.T.*, 2013 IL App (3d) 120969, ¶ 14. A copy of the actual notice is necessary to determine if the contents of the notice provided sufficient, accurate information, including an explicit statement regarding the right of the tribe, parent or Indian custodian to intervene in the proceeding. *Id.*

Without both documents in the record, a reviewing court cannot determine if there was compliance with the ICWA. *Id.*

¶ 35 As early as Dwight's dispositional hearing on April 26, 2011, the court knew or at the least had reason to know that the minors may be Indian children. See 25 U.S.C. § 1903(4) (2006) (" 'Indian child' means any unmarried person who is under age eighteen and is *** eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe"). His social history report indicated Dwight's registration in the Tribe. Even though the trial court ordered the State to produce documentary evidence of its compliance with the statute, the State did not do so. Even when allowed to supplement the record during the appeal, the State did not include its original or a copy of the actual notice sent to the Tribe. Though the letters from the Tribe are dated appropriately for a response to be in accord with the State's awareness of the minor's potential eligibility (September 16, 2011, for N.L., and February 25, 2013, for M.L.) nothing in the record originally or as supplemented informs this court of what the State submitted to the tribe to verify the minors' membership eligibility or lack thereof. There is no evidence in the record that the State complied with the ICWA as to either minor.

¶ 36 The State argues that the ICWA is inapplicable to N.L. because he is not the biological child of Dwight. Even though this fact was not known to the parties at the time notice should have been given to the Tribe, N.L. is not the biological child of Dwight and the ICWA cannot apply to him.

¶ 37 Notwithstanding the mootness of the issue with respect to N.L., the State's notice to the Tribe was insufficient with respect to M.L. The record is devoid of the original documentation the State sent to the Tribe regarding M.L.'s membership eligibility that would enable this court to determine if there actually was compliance with the ICWA. Thus, we reverse the court's orders of foster care placement and termination of parental rights for M.L. and order the proceedings to begin anew in compliance with the requirements of the ICWA.

¶ 38                                   Limits of Court's Authority

¶ 39 We next turn to the substantive issues related to the termination of Dwight's parental rights as to N.L. He asserts that the trial court exceeded its authority by finding that he no longer retained legal rights to N.L. He argues that such a right must first be legally challenged by the child, the mother, or the biological father according to the Illinois Parentage Act of 1984 (the Act) (750 ILCS 45/7(b) (West 2010)). The State argues that though the court may have exceeded its authority in severing the relationship between Dwight and N.L., the termination of parental rights is not against the manifest weight of the evidence and is, therefore, still valid.

¶ 40 We first look to whether the court actually exceeded its authority. We review issues concerning statutory construction *de novo. In re C.W.*, 199 Ill. 2d 198, 211 (2002). As discussed in *In re E.B.*, 231 Ill. 2d 459, 463 (2008), the authority to involuntarily terminate parental rights is purely statutory and the scope of the court's authority is defined by the Juvenile Court Act of 1987 (705 ILCS 405/2-4(1)(c) (West 2006)) and the Adoption Act (750 ILCS 50/0.01 *et seq.* (West 2006)). When a court exercises its authority, it " 'must proceed within the confines of that law and has no authority to act except as that law provides.' " *In re E.B*, 231 Ill. 2d at 464 (quoting *People v. Brown*, 225 Ill. 2d 188, 199 (2007)). Any action the trial court takes that is outside the statute's strictures is void. *Id.*

¶ 41　　　　Under the Act, a man is presumed to be a child's father if the child was born during his marriage to the mother. 750 ILCS 45/5(a)(1) (West 2010). The only way to disturb this presumption of paternity would be to file "[a]n action to declare the non-existence of the parent and child relationship." 750 ILCS 45/7(b) (West 2010). Such an action may only be brought by the child, the natural mother, or the presumed father and then only by verified complaint. *Id*.; see also *In re N.C.*, 2014 IL 116532, ¶ 65.

¶ 42　　　　The record shows that Dwight and Emily were married on July 11, 2010, and they have not since divorced. Thus N.L.'s birth on January 31, 2011, was during the marriage. There is no verified complaint brought by any of the statutorily designated parties seeking declaration of the nonexistence of the parent-child relationship. The only notable reference to the issue of paternity is Emily's request for a DNA test because she believed Dwight was not the biological father of N.L. After testing showed Dwight is not the biological father of N.L. and James Smith is, the record discloses no other action taken by the mother, the child, or the presumed father. The trial court's order severing the relationship between N.L. and Dwight due to the nonexistence of a biological relationship was in error and is effectively void.

¶ 43　　　　The State argues that the trial court's erroneous action was harmless. We disagree. As previously noted, the court cannot exceed the bounds of statutory requirements, which it has clearly done in this case. *In re E.B.*, 231 Ill. 2d at 463. This principle is especially important in matters that concern the fundamental liberty interest of a parent in maintaining custody of his or her child. *In re Custody of C.C.*, 2013 IL App (3d) 120342, ¶ 64. Because neither the original termination petition, naming an unknown father, nor the amended pleading, substituting Smith as N.L.'s father, listed Dwight as N.L.'s parent for purposes of the termination of parental rights, the record stands devoid of any statutorily required petition or verified complaint seeking to terminate Dwight's parental rights with respect to N.L. Thus, the matter is remanded for the State to file a petition to terminate Dwight's parental rights with respect to N.L. or obtain his surrender of parental rights in order for the adoption to go forward.

¶ 44　　　　　　　　　　　　　　　　Conflict of Interest

¶ 45　　　　Finally Dwight argues that there was ineffectiveness of counsel due to a *per se* conflict of interest. He contends that the court erred in allowing one attorney to represent both parents because their interests in the matter with respect to the children and to each other were different. We disagree.

¶ 46　　　　We review *de novo* the issue of whether counsel's representation constituted a *per se* conflict of interest, and our threshold inquiry is whether counsel represented or represents a party with conflicting interests to those of respondent. *In re A.F.*, 2012 IL App (2d) 111079, ¶ 21 (citing *In re Darius G.*, 406 Ill. App. 3d 727, 732 (2010), and *In re W.R.*, 2012 IL App (3d) 110179, ¶ 29).

¶ 47　　　　Implicit in the right to effective assistance of counsel is the right to undivided loyalty from one's attorney. *In re Johnson*, 102 Ill. App. 3d 1005, 1011 (1981). However, joint representation is not a *per se* violation of this right to effective counsel. *In re J.C.*, 163 Ill. App. 3d 877, 892 (1987) (citing *People v. Nelson*, 82 Ill. 2d 67, 72 (1980)). It is clear that "the statutory right to counsel in juvenile proceedings is violated when one attorney is appointed to represent parties with conflicting interests." *Johnson*, 102 Ill. App. 3d at 1011-12.

¶ 48    Dwight relies on *Darius G.*, which discusses the parameters of *per se* conflict of interest in the context of parental rights proceedings. *Darius G.*, 406 Ill. App. 3d 727. In *Darius G.*, the court held that "the *same* attorney may not during the proceedings appear on behalf of *different* clients." (Emphases in original.) *Darius G.*, 406 Ill. App. 3d at 738. In that case, the same attorney was appointed to the respondent and then later to the minor for the same proceeding. *Id*. Such adversarial positions being represented by the same attorney is the very definition of *per se* conflict of interest. *Id.* Case prejudice is therefore presumed and respondents need not demonstrate that the conflict contributed to the judgments entered against them. *Id*. at 739. The court's underlying concerns with the same attorney representing adversarial parties in the same proceedings were the attorney's undivided loyalty in light of opinions already formed while representing the adverse party and the attorney's ability to use confidentially gleaned information against that party while representing the other party in later proceedings. *Id.* at 734-35.

¶ 49    This ideology was reaffirmed by the court in *In re A.F.*, 2012 IL App (2d) 111079. The court in *A.F.* stated that limiting the *per se* conflict rule in termination proceedings to situations where the same attorney represents adverse parties in the same proceedings strikes the appropriate balance between ensuring conflict-free representation and protecting the best interest of the minors with stability and finality to the proceedings. *Id*. ¶ 32.

¶ 50    We find that the respondent-parents were not adverse clients thus invoking a *per se* conflict of interest. This case is clearly distinguishable from *Darius G.* because there is no evidence in the record that the parents had conflicting interests as to the children at any time prior to Escapa's request to be removed. Interests of parties must be shown to be adverse with respect to the proceedings. See *In re W.R.*, 2012 IL App (3d) 110179, ¶ 34 (noting later counsel's representation of one parent after having served as mediator in a prior family court case for the same family was *per se* conflict of interest); *In re Paul L.F.*, 408 Ill. App. 3d 862, 865 (2011) (noting an unacceptable rotation of representation between mother, father, and minor).

¶ 51    From the time Dwight and Emily accepted joint representation by Escapa until Escapa requested removal as Dwight's representative, their interests were not different or adversarial with respect to the custody of their children and their family. After Escapa's appointment to represent Emily, Dwight indicated that he was in accord with Escapa also representing him. Dwight further stated that there was no conflict when queried by the judge. In fact, the record shows that the couple had been in marriage counseling and was making progress. Further, Dwight noted in counseling that not having his family together caused him the most stress. Until Escapa's request to be removed as counsel for Dwight, the record reflects that Dwight and Emily's intent was to remain married and regain custody of their children. Though individually the record shows that their efforts failed to meet the measurements put in place by the court and the State, there is no evidence that such failings were used by either party to advance his or her respective status as a fit parent. See *Johnson*, 102 Ill. App. 3d at 1012 (noting parties' positions to be antagonistic where each party accused the other of being the cause of the minor's injuries).

¶ 52    Dwight argues that there was clear evidence of a conflict because the mother had already been adjudged unfit while being represented by Escapa and that the petition filed on the same day Escapa entered his appearance for the respondent-parents included an allegation of domestic violence presumably between the parents. He further argues that evidence of Escapa's ineffective representation is shown by his failing to assert the rights of the Tribe in

the proceedings. However, these assertions are without merit. As previously noted, a *per se* conflict of interest exists in cases where the interest of the parties contesting the representation is adverse.

¶ 53 Though Escapa had represented Emily in prior proceedings, we have already discussed how the parties were not adversaries and possessed a joint interest in reestablishing their family, thus making the prior representation irrelevant. The contention that the domestic violence allegations in the initial petition are evidence of adversity is effectively hypothetical and speculative because it is not supported by the record. See *In re J.C.*, 163 Ill. App. 3d 877, 892 (1987) ("mere hypothetical or speculative conflicts of interest will not suffice"). Once Escapa learned of potential adversity, the contemplated separation of the parties due to N.L.'s paternity, he then requested removal as Dwight's counsel. The domestic violence incidents leading to Dwight's incarceration on March 8, 2012, are not evidence of adversity with respect to the youth.

¶ 54 Now with respect to the ICWA, as noted above, it was the court's responsibility to verify on the record whether or not the minors were "Indian children." Thus, Escapa did provide Dwight with effective representation.

¶ 55                                    CONCLUSION

¶ 56 Though the trial court lacked jurisdiction to rule on the motion to supplement the record on appeal, the supplementation, as limited by this court, is allowed in the interest of justice. This case is remanded to proceed anew with regard to M.L. because the State failed to provide adequate notice to the Tribe pursuant to the ICWA and for the State to file a petition to terminate Dwight's parental rights with regard to N.L. or obtain his surrender of parental rights. We also find there was no *per se* conflict of interest that deprived Dwight of effective counsel.

¶ 57 Reversed and remanded.

¶ 58 JUSTICE WRIGHT, specially concurring.

¶ 59 I concur with the majority's position on all issues. However, I write separately to discuss, in greater detail, the procedural significance of both the pleadings and the statutory presumption of paternity based on marriage.

¶ 60 First, I note the State's brief contains an incorrect assertion that the amended petition to terminate the parental rights of N.L.'s father "did not remove [Dwight] as a party to the termination petition concerning N.L." I emphasize that the original petition to terminate the parental rights of N.L.'s father listed N.L.'s father as "unknown," and clearly did not name any person as N.L.'s father in the termination petition. Thus, contrary to the State's position, the original termination petition did not identify Dwight in any parental capacity or seek to truncate his specific paternal rights with respect to N.L. Later, the State's amended termination petition named one man, Smith, as N.L.'s father and requested the court to terminate Smith's rights, if any, based on desertion and having no contact with N.L. since birth.

¶ 61 Well-established case law provides, "Where an amended pleading is complete in itself and does not refer to or adopt the prior pleading, the earlier pleading ceases to be part of the record for most purposes and is effectively abandoned and withdrawn." *Barnett v. Zion Park District*,

171 Ill. 2d 378, 384 (1996). It is clear to me that the subsequently amended petition to terminate parental rights simply removed the unknown father as respondent and substituted Smith as the only alleged father-respondent for purposes of the termination petition. Thus, Dwight was not named as a party for purposes of termination of Smith's parental rights, if any.

¶ 62        Next, I respectfully submit that the circumstance of birth does not automatically create paternal rights when the biological father is not married to the biological birth mother of a child. For example, if the biological birth mother is married when she gives birth to her child, her husband is presumed, by statute, to be the newborn's father without required genetic testing. 750 ILCS 45/5(a)(1) (West 2012). Consequently, in the case at bar, I point out that the State correctly named Dwight as the legal father of N.L. in the underlying neglect petition since Dwight was married to N.L.'s mother at the time of birth.

¶ 63        Ultimately, the court entered a judgment finding that the State's evidence was sufficient to prove the allegations of the neglect petition, which included an allegation that Dwight was N.L.'s father. Following the court's determination of neglect, I respectfully suggest that Dwight was not just N.L.'s presumed father, according to statute, but that Dwight became N.L.'s *adjudicated* father, based on the court's ruling in the underlying *neglect* petition.

¶ 64        Rather than requesting the court to vacate the adjudication of neglect that included the State's factual allegation that Dwight was N.L.'s legal father, the State filed an amended *termination* petition, in the same case, asking the court to terminate Smith's paternal rights, if any, with respect to N.L. I respectfully submit the State erroneously sought to terminate Smith's parental rights, rather than Dwight's parental rights, for two reasons. First, Smith did not have any *legally* recognizable paternal rights as N.L.'s undisputed biological father, because N.L.'s mother was married to another man and a court order had not declared the existence of Smith's paternity as required by statute. 750 ILCS 45/7 (West 2012). Second, and most importantly, the trial court previously adjudicated Dwight as N.L's father, in the same case, after finding the State proved the underlying neglect petition, which included an allegation that Dwight was N.L.'s father. Nonetheless, the termination of Smith's paternal rights, if any, had no impact on Dwight's ongoing legal status as N.L.'s legal father since the State did not attempt to terminate Dwight's parental rights at any point in time.

¶ 65        Once Dwight was adjudicated by court order to be N.L.'s legal father in the underlying neglect proceeding, I submit that neither the State nor the court could *sua sponte* terminate Dwight's parental rights based on DNA *alone*. 750 ILCS 45/7(b-5) (West 2012). Absent a request from Dwight to sever his father/child relationship with N.L., the trial court had no inherent powers to deviate from the statute and extinguish Dwight's parentage. See *In re Parentage of G.E.M.*, 382 Ill. App. 3d 1102, 1112-13 (2008).

¶ 66        Justifiably, the State may elect to file a future petition to terminate Dwight's paternal rights based on Dwight's inability to parent his child under section 2-29(2) of the Juvenile Court Act (705 ILCS 405/2-29(2) (West 2012)). However, Dwight's parental rights cannot be involuntarily terminated by the court until the State files a petition to terminate Dwight's parental rights based on his conduct, rather than his DNA. As recognized by the majority, Dwight may voluntarily elect to surrender his paternal rights.

¶ 67        My understanding of the status of the law provides that, when a woman gives birth to a child, the physical act of delivering a child by live birth vests the woman with automatic legal status as a natural parent of her child, regardless of genetics. When a child's birth mother is lawfully married at the time of birth, the birth mother's spouse is presumed to be the legal

father of the child without the necessity of DNA testing to establish his paternity. 750 ILCS 45/5(a)(1) (West 2012). Thus, a child born to a married woman with a male spouse, as in this case, enters the world with both a legal mother and legal father.

¶ 68　　　However, when the natural mother is not married at the time of birth, a child enters the world with one legal parent and no other person is automatically presumed to be the second legal parent of the child at the time of birth.[1]

¶ 69　　　In the case at bar, the birth mother was married at the time of birth to someone other than the biological father of this child. Under these circumstances, the biological father acquires no automatic or presumed legal status as a parent of the birth mother's child, absent proper statutory pleadings and a valid adjudicated court order. Instead, the birth mother's spouse is legally recognized as the child's second parent at the time of birth.

¶ 70　　　For the foregoing reasons, I specially concur.

---

[1]I note that another parent may acquire equal legal status to co-parent the child of an unwed birth mother, without DNA testing, based on a statutory conclusive presumption of paternity, if the child's birth mother and the purported father signed an acknowledgment of paternity near the time of birth. This conclusive presumption of paternity can only be negated if the acknowledgement of paternity is rescinded within 60 days or vacated by a subsequent court order. 750 ILCS 45/5(b) (West 2012).